The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| THE SHERWIN-WILLIAMS COMPANY | COUNTY OF DELAWARE, PENNSYLVANIA, et. al. |

**(b)** County of Residence of First Listed Plaintiff   Cuyahoga, Ohio
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   DELAWARE
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
KANE PUGH KNOELL TROY AND KRAMER
510 SWEDE STREET
NORRISTOWN, PA 19401

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government   Plaintiff
- ☒ 3   Federal Question   (U.S. Government Not a Party)
- ☐ 2   U.S. Government   Defendant
- ☐ 4   Diversity   (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | | | | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983
Brief description of cause:
DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF : FIRST AMENDMENT, DUE PROCESS

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*   JUDGE _____   DOCKET NUMBER _____

DATE: 10/22/2018

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**18    4517**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 101 West Prospect Avenue, Cleveland, Ohio 44115 _____

Address of Defendant: _____ Various Addresses in Pennsylvania _____

Place of Accident, Incident or Transaction: _____ Various Counties within Commonweath of Pennsylvania _____

---

*RELATED CASE, IF ANY:*

Case Number _____   Judge _____   Date Terminated _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1   Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☐   No ☑

2   Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes ☐   No ☑

3   Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?     Yes ☐   No ☑

4   Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE **10/22/2018** _____   _____   **54843**
_Attorney-at-Law / Pro Se Plaintiff_          _Attorney I D # (if applicable)_

---

**CIVIL:** (Place a √ in one category only)

*A.     Federal Question Cases:*

☐ 1   Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2   FELA
☐ 3   Jones Act-Personal Injury
☐ 4   Antitrust
☐ 5   Patent
☐ 6   Labor-Management Relations
☑ 7   Civil Rights
☐ 8   Habeas Corpus
☐ 9   Securities Act(s) Cases
☑ 10  Social Security Review Cases
☐ 11  All other Federal Question Cases
       *(Please specify)* _____

*B.     Diversity Jurisdiction Cases:*

☐ 1   Insurance Contract and Other Contracts
☐ 2.  Airplane Personal Injury
☐ 3   Assault, Defamation
☐ 4   Marine Personal Injury
☐ 5   Motor Vehicle Personal Injury
☐ 6   Other Personal Injury *(Please specify)* _____
☐ 7.  Products Liability
☐ 8   Products Liability – Asbestos
☐ 9.  All other Diversity Cases
       *(Please specify)* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, William H Pugh, V, Esq , counsel of record *or pro se plaintiff*, do hereby certify:

☐   Pursuant to Local Civil Rule 53 2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000 00 exclusive of interest and costs:

☑   Relief other than monetary damages is sought.

OCT 22 2018

DATE **10/22/2018** _____   _____   **54843**
_Attorney-at-Law / Pro Se Plaintiff_          _Attorney I D # (if applicable)_

NOTE   A trial de novo will be a trial by jury only if there has been compliance with F R C P 38

Civ 609 (5/2018)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| The Sherwin-Williams Company | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| County of Delaware, PA, et. al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                        ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                           ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.  (X)

| | | |
|---|---|---|
| October 22, 2018 | William H. Pugh, V., Esq. | The Sherwin-Williams Company |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 267-234-1330 | 610-275-2018 | WPugh5@kanepugh.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

THE SHERWIN-WILLIAMS COMPANY,          )
                                       )
              Plaintiff,               )
                                       )
        v.                             )          **COMPLAINT**
                                       )
COUNTY OF DELAWARE,                    )   Civil Action No. _____
PENNSYLVANIA; ERIE COUNTY,             )
PENNSYLVANIA; COUNTY OF YORK,          )   Judge _____
PENNSYLVANIA; JOHN P. McBLAIN, in      )
his official capacity as Chairman of the   )
County Council of the County of Delaware,  )
Pennsylvania; COLLEEN P. MORRONE, in   )
her official capacity as Vice Chairman of the
County Council of the County of Delaware,
Pennsylvania; MICHAEL CULP, in his
official capacity as Member of the County
Council of the County of Delaware,
Pennsylvania; KEVIN M. MADDEN, in his
official capacity as Member of the County
Council of the County of Delaware,
Pennsylvania; BRAIN P. ZIDEK, in his
official capacity as Member of the County
Council of the County of Delaware,
Pennsylvania; DR. KYLE W. FOUST, in his
official capacity as County Council Chairman
of the Erie County Council; FIORE LEONE,
in his official capacity as Council Vice
Chairman of the Erie County Council;
KATHY FATICA, in her official capacity as
Finance Chairwoman and Member of the Erie
County Council; CAROL J. LOLL, in her
official capacity as Finance Vice Chairwoman
and Member of the Erie County Council;
ANDRE R. HORTON, in his official capacity
as Personnel Chairman and Member of the
Erie County Council; CARL ANDERSON III,
in his official capacity as Member of the Erie
County Council; SCOTT R. RASTETTER, in
his official capacity as Member of the Erie
County Council; SUSAN BYRNES, in her
official capacity as President of the Board of
Commissioners for York County,

Pennsylvania; DOUG HOKE, in his official
capacity as Vice President of the Board of
Commissioners for York County,
Pennsylvania; CHRIS REILLY, in his official
capacity as a Member of the Board of
Commissioners for York County,
Pennsylvania; JOHN DOE COUNTIES; and
JOHN DOES,

                    Defendants.

## NATURE OF THE CASE

1.      The Sherwin-Williams Company seeks injunctive and declaratory relief to

prevent the unconstitutional chilling and violation of its rights under the First Amendment and

Due Process Clause of the United States Constitution and to declare its rights, obligations, duties,

and liabilities in connection with a controversy that has arisen between it and a number of

counties and public officials in Pennsylvania.  On information and belief based on filings, public

resolutions, statements, and media reports, the defendant Counties, acting through the defendant

public officials, have retained or are in the process of retaining counsel and intend to sue

Sherwin-Williams in various courts throughout Pennsylvania to pay for the inspection and

abatement of lead paint in or on private housing and publicly owned buildings and properties,

including federal buildings and properties.  Sherwin-Williams believes that these well-

intentioned counties and public officials have been misled by contingency-fee trial lawyers who

are acting pursuant to a common strategy to stir up litigation for their own gain across the

Commonwealth in flagrant disregard of Sherwin-Williams' constitutional rights.  In fact, by

providing inaccurate and incomplete information on the facts and the law, these lawyers have

already convinced Montgomery and Lehigh counties to file suits against Sherwin-Williams and

certain other former manufacturers of lead paints and pigments.  The constitutional rights at

- 2 -

stake immediately affect the ability of manufacturers to promote their products individually and through trade associations.

2.      Sherwin-Williams' constitutionally-protected rights are at risk now.  The threatened lawsuits will assert a new and overreaching theory of public nuisance basing liability on Sherwin-Williams' constitutionally-protected speech and right of association.  The threatened lawsuits unlawfully chill Sherwin-Williams' First Amendment rights to engage in commercial speech, to associate with others in trade associations, to petition the government, and to speak on public issues.

3.      Further adding to the unlawfulness and arbitrariness of the threatened actions, the Counties, following a common strategy of their outside counsel, will contend that they need not prove causation by identifying any person who was actually harmed by a Sherwin-Williams' product.  Moreover, in conflict with established Pennsylvania law, they will act in the absence of a public right and not put any responsibility on property owners, the sole persons who have had control over the paint on their properties as well as the sole ability to maintain products that were sold over a half of a century ago and that have outlived their useful life.  The Counties retroactively seek to apply new legal standards that did not exist at the time Sherwin-Williams acted decades ago and that are in conflict with past and current statutes, regulations, and common law.  In addition, at the time Sherwin-Williams was participating in trade associations and speaking on the sale of lawful products decades ago, it was scientifically impossible to have known about the harms allegedly at issue today—minute levels of lead in the blood stream.  The Counties are attempting to apply today's medical knowledge and standards to Sherwin-Williams' conduct that occurred over 50 years ago.  Therefore, the Counties' anticipated claims of liability would be impermissibly retroactive, arbitrary, vague, and prejudicially delayed in violation of

due process of law. For this reason, too, the federal constitutional rights at stake are of concern to numerous manufacturers and promoters of products lawfully made and sold decades ago.

4.     The Counties and their officers, moreover, have impermissibly combined and are acting in concert to impair Sherwin-Williams' rights to due process by entering into unlawful contingency fee agreements with trial lawyers that violate due process by delegating to private attorneys the Counties' police power to bring public nuisance claims. Because the Counties are purportedly intending to bring these public nuisance claims to enforce quasi-sovereign rights on behalf of the public, the Counties may not delegate their police power to private contingency-fee trial attorneys who are not bound by the duties of public prosecutors to act in the interest of fairness and justice, but whose incentive is to receive the largest recovery. Nevertheless, Delaware County has entered into a constitutionally infirm contingency fee agreement with private trial attorneys to commence a public nuisance lawsuit against Sherwin-Williams, and the trial attorneys have discussed their proposed complaint and fee agreement with Erie and York Counties, and they are reportedly shopping their public nuisance complaint and fee agreement to every other county in Pennsylvania.

5.     The substantial financial burden currently being imposed on Sherwin-Williams by the imminent threat of these multiple lawsuits unlawfully brought by self-interested trial lawyers further justifies immediate determination and protection of Sherwin-Williams' federal constitutional rights.

6.     The trial lawyers are acting in concert with the Counties and their public officials pursuant to a common strategy to deprive Sherwin-Williams of its federal constitutional rights. To protect Sherwin-Williams' constitutional and other federal rights and prevent the Defendants from embarking on multiple baseless lawsuits that will not benefit Pennsylvania residents, that

- 4 -

could create health risks, and that would contravene federal and local regulatory pronouncements, Sherwin-Williams seeks a declaration of its rights, duties, and obligations and an injunction precluding Defendants from suing Sherwin-Williams in violation of those declarations.

Plaintiff, The Sherwin-Williams Company, brings this action pursuant to 42 U.S.C. § 1983 for declaratory and injunctive relief and alleges as follows:

## INTRODUCTION

7.      In disregard of Sherwin-Williams' federal constitutional rights as well as federal and Pennsylvania law, Delaware County has retained or is about to retain counsel and imminently intends to sue Sherwin-Williams, alleging that Sherwin-Williams should be held liable for its participation in trade associations and its protected speech during the time it lawfully manufactured, promoted, and sold lead paints and pigments many decades ago. *See, e.g.*, Ex. A (News articles:  Justin Sweitzer, *Lehigh County retains firm for lead paint lawsuit*, WMFZ (Sept. 26, 2018, 11:26 PM) and Tom Shortell, *Lehigh County demands paint industry help with lead abatement*, THE MORNING CALL (Oct. 1, 2018)); Ex. B (Lehigh County Council Resolution 2018-51); Ex. C at ¶¶ 15 n.7, 15 n.8, 39, 75, 126 (Complaint, *Cty. of Montgomery v. Atlantic Richfield Co.*, No. 2018-23539 (Ct. Common Pleas, Montgomery Cty. 2018)).  Two other counties—Montgomery County and Lehigh County—have already retained the same private trial lawyers retained or likely to be retained by Delaware County and have already sued Sherwin-Williams on these grounds.  The same trial lawyers have said that they are actively soliciting other Counties in Pennsylvania to bring substantively similar suits against Sherwin-Williams and have conferred with York and Erie Counties. *See* Ex. A;  *see also* Lehigh Cty. Governance Com. Hearing at 38:00-38:46 (Sept. 12, 2018) ("There are 67 counties in

Pennsylvania. Obviously it would be my hope that we [would] be able to represent all of them.")).[1]

8.     These lawsuits all seek to hold Sherwin-Williams liable under the theory of public nuisance for its membership in trade associations, prior commercial speech, and communications with legislators and regulators in connection with its manufacture, sale, and promotion of lead-containing pigments or paints during the first half of the twentieth century.

9.     The trial lawyers, attempting to garner contingency fees, seek to instigate a wave of litigation on behalf of some or all Pennsylvania counties. Through their solicitation, the trial lawyers are misleading the Counties as to both the facts concerning Sherwin-Williams and the law in order to induce them to bring lawsuits, even though they do not have evidence that Sherwin-Williams' lead paints or pigments are in or on the Counties' buildings or the buildings of their constituents. Indeed, reports indicate that county officials in jurisdictions that have already brought suit at the behest of these trial lawyers felt rushed to sue. *See* Ex. A (a Lehigh County Commissioner stating at a hearing in which the trial lawyers were retained to sue Sherwin-Williams, "I think we're kind of rushing into this. We should take more time to review this particular issue"). In addition, on information and belief, the trial lawyers have failed to investigate the facts concerning the sources of lead other than old paint causing elevated blood lead levels in the Counties or to advise the Counties of their responsibility for sources of lead in County-owned or managed buildings, playgrounds, community centers, water systems, and other facilities. On information and belief, they have failed to advise the Counties of their potential liabilities for failing to prevent or remediate lead hazards in County-owned or managed properties, or for failing to enforce laws requiring property owners to prevent or remediate lead

---

[1] Video of the hearing available at http://hosting.videominutes.net/player?handshake=36825&video=3331.

hazards.  Nor apparently, on information and belief, have the trial lawyers advised the Counties

that Pennsylvania law, followed by the United States Court of Appeals for the Third Circuit,

precludes the Counties' contemplated public nuisance claim against Sherwin-Williams.

10.     The Counties and their trial lawyers also have apparently failed to sue, or even

conduct any investigation into, the other potential sources that contributed and continue to

contribute to the presence of lead in the Counties' soil, air, food, household products, and

water—all sources of accessible lead.  For example, lead from gasoline was, for years, emitted

through the air into the soil and water in Pennsylvania.  *See, e.g.*, Howard W. Mielke & Patrick

L. Reagan, "Soil is an Important Pathway of Human Lead Exposure," 106 *Envtl. Health*

*Perspectives* 217, 227 (1998) (concluding that lead in soil, caused primarily by automobile

emissions, is at least as great of risk to children as lead-based paint).  By threatening to sue only

Sherwin-Williams and a few other former lead pigment and lead paint manufacturers and

refusing to identify the source or manufacturer of the lead purportedly causing elevated blood

lead levels in any person at any location, the Counties acting together with the trial lawyers seek

to hold Sherwin-Williams disproportionately liable for harms to which it did not contribute in

violation of due process of law.

11.     The Counties and trial lawyers are attempting to harm Sherwin-Williams by filing

a large number of lawsuits in many different courts throughout the Commonwealth of

Pennsylvania.  The mere filing of lawsuits by lawyers who have an improper financial incentive

in the result of a lawsuit purportedly brought to protect the rights of the public will violate

Sherwin-Williams' constitutional rights and cannot be remedied.  The trial lawyers and Counties

are seeking to coerce Sherwin-Williams to pay money to settle meritless lawsuits through the

expense, threat, and risk of defending a multiplicity of lawsuits in a number of counties

throughout the Commonwealth. *See* Lehigh Cty. Governance Com. Hearing at 27:58-28:43 (Sept. 12, 2018) (In presenting to the committee, a representative of the trial lawyers stated, "We would settle that case for somewhere in the nature of a mathematical formula . . . .").

12.     The lawsuits threatened by the Counties contend that the *presence* of lead-containing paint in all buildings is a public nuisance, which must be abated at the potential cost of tens of millions of dollars to Sherwin-Williams in each county. However, the mere presence of lead paint is not a lead hazard. In reality, a lead paint hazard is defined as deteriorated lead paint or lead dust exceeding permissible levels. *See* 66 Fed. Reg. 1206 (Jan. 5, 2001) (codified at 40 C.F.R. pt. 745). Lead paint and other lead hazards arise when private property owners, the County, and other public entities have failed to maintain their properties and the lead-containing paint within them, creating potentially hazardous conditions. Because property owners, including the Counties, actually control the continued presence, condition and maintenance of lead paint, create any lead paint hazard, and bear legal and financial responsibility for preventing and abating any lead paint hazards in their properties, they are directly responsible for creating the risk underlying the alleged public nuisance. Rather than prosecuting the culpable individuals for violating the law or for allegedly causing harm, the Counties are impermissibly attempting to shift their public responsibilities to maintain their buildings and properties and to enforce the law against negligent property owners onto Sherwin-Williams. If these lawsuits spread and succeed, millions of homes in the Commonwealth would be declared public nuisances, a label that brings with it a number of legal and financial consequences for property owners. Moreover, the Counties' counsel have advocated pursuing the purported "deep pockets" of Sherwin-Williams to abate all lead-containing paint within the Counties' boundaries, whether or not it is hazardous, poses any threat, or has caused any loss to the Counties in order to reap a larger contingency fee.

13.     The Counties and their trial lawyers base their misleading theory on Sherwin-Williams' constitutionally protected speech and association. The Counties will likely premise liability—as those counties who have already filed suit have done—on Sherwin-Williams' membership in various trade associations, including the Lead Industries Association ("LIA") and the National Paint Varnish and Lacquer Association ("NPVLA," now called the American Coatings Association – "ACA"), its purported petitioning to the state, local, and federal government regarding various proposed laws and regulations, its commercial speech, and its expression of public opinions. *See e.g.*, Ex. C at ¶¶ 110-11.

14.     Putting aside the lack of evidentiary support for those allegations, the threat of multiple lawsuits against Sherwin-Williams based on such constitutionally-protected speech and associational activity impermissibly chills its speech and associational activities today. In light of this threat, Sherwin-Williams has reconsidered and continues to question its membership in various trade organizations and its petitioning to the government on any issues. The Counties' threat of litigation across the Commonwealth of Pennsylvania is further chilling Sherwin-Williams' exercise of its federal constitutional rights.

15.     The Counties' threatened lawsuits are meritless as a matter of constitutional, federal and state law. Manufacturers of products, under Pennsylvania law, are not insurers of their products and are not required to make products that last forever. Sherwin-Williams did not create the alleged hazards, did not maintain the alleged hazards, does not have access to or control over private and public properties with lead paint, and has no ability to inspect for or abate the alleged hazards. Sherwin-Williams' only acts were lawfully participating in trade associations, lawfully exercising its right to comment on proposed laws and regulations, lawfully

advertising its products, and lawfully manufacturing, selling, and promoting lead-containing paint and lead pigments many decades ago.

16.     The harms alleged by the Counties arise from low-level lead exposures undetectable and unknowable without the aid of modern technology and epidemiology. At the time Sherwin-Williams was participating in trade associations, engaging in other protected speech and activity, and manufacturing, selling, and promoting lead-containing pigments and paints, it had no knowledge that lead-containing paint could cause those alleged harms. In fact, such knowledge was scientifically impossible. Tests to measure blood lead levels did not even exist until the 1930s, and were still only available to a very few public health departments by the 1950s. And it was not until 2003 that the first study purported to find cognitive effects of blood lead levels below 10 μg/dL. This threat of disproportionate, retroactive liability imposes severe, unexpected financial hardship and disrupts settled business arrangements and plans.

17.     Because of the trial lawyers' misleading campaign of solicitation and their distorting the facts and the law, which resulted in the unlawful contingent fee agreements, Sherwin-Williams now faces the imminent filing of a number of new, unsubstantiated lawsuits by counties in Pennsylvania. The threat of such lawsuits chills Sherwin-Williams' exercise of its federal constitutional rights, and the imminent filing of these suits would irreparably harm Sherwin-Williams, its employees, shareholders, and retirees, violate its constitutional rights, and trespass on areas preempted by federal statutory law. *See e.g.*, Federal Hazardous Substances Act, 15 U.S.C. §§ 1261-78. Because of the multiple suits that are likely to be filed in different counties and before different courts, Sherwin-Williams will almost certainly receive inconsistent rulings and incur great hardship. The multi-jurisdictional attack on Sherwin-Williams is designed to financially injure Sherwin-Williams. Forcing Sherwin-Williams to litigate multiple

suits, which would chill and violate its constitutional rights, and wait years for appellate review to secure uniformity and finality would be justice denied. Just one erroneous verdict can have immediate, severe impact on a corporation's business, employees, shareholders, and reputation that cannot be remedied through the appellate process. In light of this imminent threat and the real likelihood of multiple, inconsistent rulings, this Court should grant this declaratory and injunctive action to protect Sherwin-Williams' federal constitutional and statutory rights.

18.     This civil action seeks to determine and declare, in a single forum, the rights and obligations of Sherwin-Williams under federal law and to enjoin Defendants from suing Sherwin-Williams in violation of those declarations. Sherwin-Williams seeks several declarations of its rights and duties:

(A)     The Counties' attempt to hold Sherwin-Williams liable for its membership in trade associations, its petitioning of the government, or its commercial speech impermissibly chills the exercise of and violates Sherwin-Williams' rights under the First Amendment of the United States Constitution;

(B)     The Counties' threatened claims premised on public nuisance are arbitrary, impermissibly vague, and prejudicially delayed and, if permitted to proceed, would impose disproportionate and retroactive liability without fair notice in violation of the Due Process Clause;

(C)     Public nuisance claims brought by a public body under its police power to protect the public health and safety cannot be filed or prosecuted by trial lawyers who have a financial incentive to secure a recovery; and

(D)     Any claim that Sherwin-Williams' product warnings were inadequate after the passage of the Federal Hazardous Substances Act is preempted by that Act.

These declarations would protect Sherwin-Williams' federal constitutional rights, would help to consistently resolve all disputes with the Pennsylvania Counties against Sherwin-Williams, and would prevent a tremendous waste of judicial resources.

**PARTIES**

19.     Sherwin-Williams is an Ohio corporation with its principal place of business in the State of Ohio.  In the Commonwealth, Sherwin-Williams employs almost 2,000 employees across 200 Company-owned stores, division offices, two manufacturing plants, and a research and development facility.  In Delaware County, Pennsylvania alone, Sherwin-Williams operates 31 facilities employing 85 individuals.

20.     The County of Delaware is a body corporate and politic, political subdivisions, and municipality of the Commonwealth of Pennsylvania with its County Seat located in Media, Pennsylvania.

21.     The County of Erie is a body corporate and politic, political subdivisions, and municipality of the Commonwealth of Pennsylvania with its County Seat located in Erie, Pennsylvania.

22.     The County of York is a body corporate and politic, political subdivisions, and municipality of the Commonwealth of Pennsylvania with its County Seat located in York, Pennsylvania.

23.     Upon information and belief, John P. McBlain is the Chairman of the County Council of Delaware County, Pennsylvania and a resident of Pennsylvania.

24.     Upon information and belief, Colleen P. Morrone is the Vice Chairman of the County Council of Delaware County, Pennsylvania and a resident of Pennsylvania.

25.     Upon information and belief, Michael Culp is a member of the County Council of Delaware County, Pennsylvania and a resident of Pennsylvania.

- 12 -

26.     Upon information and belief, Kevin M. Madden is a member of the County Council of Delaware County, Pennsylvania and a resident of Pennsylvania.

27.     Upon information and belief, Brian P. Zidek is a member of the County Council of Delaware County, Pennsylvania and a resident of Pennsylvania.

28.     Upon information and belief, Dr. Kyle W. Foust is the Chairman of the County Council of Erie County, Pennsylvania and a resident of Pennsylvania.

29.     Upon information and belief, Fiore Leone is the Vice Chairman of the County Council of Erie County and a resident of Pennsylvania.

30.     Upon information and belief, Kathy Fatica is the Finance Chairwoman and a Member of the County Council of Erie County, Pennsylvania and a resident of Pennsylvania.

31.     Upon information and belief, Carol J. Loll is the Finance Vice Chairwoman and a Member of the County Council of Erie County, Pennsylvania and a resident of Pennsylvania.

32.     Upon information and belief, Andre R. Horton is the Personnel Chairman and a Member of the County Council of Erie County, Pennsylvania and a resident of Pennsylvania.

33.     Upon information and belief, Carl Anderson III is Member of the County Council of Erie County, Pennsylvania and a resident of Pennsylvania.

34.     Upon information and belief, Scott R. Rastetter is as Member of the County Council of Erie County, Pennsylvania and a resident of Pennsylvania.

35.     Upon information and belief, Susan Byrnes is the President of the Board of Commissioners for York County, Pennsylvania and a resident of Pennsylvania.

36.     Upon information and belief, Doug Hoke is the President of the Board of Commissioners for York County, Pennsylvania and a resident of Pennsylvania.

37.     Upon information and belief, Chris Reilly is a Member of the Board of Commissioners for York County, Pennsylvania and a resident of Pennsylvania.

38.     John Doe Counties include all counties, public entities, political subdivisions, or municipalities in the Commonwealth of Pennsylvania, except for the Commonwealth of Pennsylvania or any of its departments or agencies or the counties of Montgomery and Lehigh, which, presently unknown to Sherwin-Williams, have sued, have authorized a lawsuit, or have retained counsel or have plans to sue Sherwin-Williams, under any legal theory, because of its membership in trade associations, petitioning activities or commercial speech in connection with the former manufacture, sale, marketing or promotion of lead-based paints or lead pigments, or because of its alleged failure to warn adequately about the risks of ingestion or inhalation of lead-based paints or lead pigments.

39.     John Does are all county and municipal officials in the Commonwealth of Pennsylvania, their representatives or agents except those in the counties of Montgomery and Lehigh who, presently unknown to Sherwin-Williams, have filed suit, have authorized a lawsuit, or have retained counsel or have plans to sue Sherwin-Williams because of its membership in trade associations, petitioning activities or commercial speech in connection with the former manufacture, sale, marketing or promotion of lead-based paints or lead pigments, or because of its alleged failure to warn adequately about the risks of ingestion or inhalation of lead-based paints or lead pigments.

40.     All named Counties, individuals, John Doe Counties, and John Does shall collectively be referred to as "Counties."

## JURISDICTION AND VENUE

41.     Because this action arises under the Constitution and laws of the United States, this Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

- 14 -

42.     Additionally, this Court has diversity jurisdiction over Sherwin-Williams' claims under 28 U.S.C. § 1332.  Sherwin-Williams and the Counties are diverse from one another.  The Counties imminent claims against Sherwin-Williams seek inspection and abatement costs in the tens of millions of dollars.

43.     Defendants are depriving Sherwin-Williams of rights secured by the Constitution and federal law in violation of 42 U.S.C. § 1983.  Thus, this Court also may exercise subject matter jurisdiction under Section 1983 and 28 U.S.C. 1343(a)(3).

44.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1), (b)(3) & (c) because the Counties reside within the Commonwealth of Pennsylvania and at least one of them resides in this judicial district.  Venue is also proper under 28 U.S.C. § 1391(b)(2) and (c), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## BACKGROUND

### Intact, Well-Maintained Lead Paint Is Not A Lead Hazard or Public Nuisance

45.     Since its founding more than 150 years ago in 1866, Sherwin-Williams has acted responsibly and with concern to produce high quality products that are safe when used and maintained as intended.  Today, intact, well-maintained lead-based paint does not present a health risk.  As with any consumer product, lead-containing paint, which was made and applied decades ago, must be maintained, kept in good repair and appropriately taken care of when its useful life has ended.  Property owners have the responsibility under Pennsylvania and local law to maintain their properties, including paint, and to protect themselves and others from any health risks that might arise from their failure to maintain old, worn-out lead-based paint.

46.     Unlike lead in water or air, lead-containing paint seldom presents any risk in county buildings themselves because employees and visitors are over the typical age of concern

- 15 -

for lead exposure from paint chips or dust, and county public buildings are routinely maintained and cleaned.  No public health report, to Sherwin-Williams' knowledge, has ever attributed an elevated blood lead level in a child to lead-based paint in the Counties' public, non-residential buildings.

47.     Blood lead levels in children are at an historic low and continue to decline across all ages and groups.  The incidence of elevated blood lead levels in children from any source, moreover, has declined dramatically during the last few decades, after lead was removed from several sources other than paint, such as gasoline, solder, and food containers.  According to published reports, symptomatic childhood lead poisoning has essentially disappeared in this country.  Therefore, the existing and threatened suits against Sherwin-Williams are not based on any report or data suggesting that the mere presence of lead-based paint presents any significant health risk to the Counties' residents.

48.     Lead paint typically remains buried under many layers of non-lead paint, does not generate harmful lead dust, and does not need to be abated when it is maintained and intact.  Congress has concluded that the presence of lead paint in buildings poses "no immediate threat to the safety of children."  *See* P.L. 102-550, Housing and Community Development Act of 1992, S. Rep. No. 332, 102nd Cong., 2d Sess. 262-63, 1992 WL 184100 (1992); *see also* 66 Fed. Reg. 1206 (Jan. 5, 2001) (codified at 40 C.F.R. pt. 745).  Notwithstanding these federal pronouncements, the trial lawyers are misleading the Counties into believing that they should sue Sherwin-Williams and hold it liable for costly, unnecessary abatement programs.

### Basic Information about Lead-Based Pigments and Paints

49.     Lead is one of the most historically useful metals.  Lead has been used in the manufacture of many products, such as food cans, cosmetics, pipe, solder, and toys.  Even today, leaded crystal glasses, decanters, and other leaded glassware are commonly used, and lead is

used in dozens of products, such as auto batteries, computers, lead stabilizers for plastics and protective covering for wire, despite lead's known toxicity if ingested.

50.     Lead pigments were used in paint for hundreds of years and were considered to be the premier paint products for both interior and exterior uses.  Indeed, the quick-drying paint that we know today did not exist until the 1940s and prior to the late 1800s the ready-mixed paint in any form did not exist.  Rather, the constituent chemicals that comprised paint at that time—such as white lead pigment, linseed oil, and thinners—were purchased separately and mixed together by master painters and had to be applied over a period of days due to long drying times and the need to sand between coats.  Because of this mixing process and labor intensive application, most paint was applied by professional painters.  During this time, those professional painters considered lead pigments to be the best ingredients available for paints because they lasted longer and presented a better surface for repainting.

51.     During the first half of the 20th century, when most lead-based architectural paints were made and sold in the United States, federal and state governments, painters, and the public continued to view lead paints as the best paints available on the market.  Lead paints were perceived to adhere to surfaces better than other paints and thus were seen as more durable and lasting.  Lead paints also protected surfaces better than alternatives; for example, lead paints protected wood surfaces from water and sun damage, and protected metal from rusting.  In the early decades of the 1900s, when an influenza pandemic killed over a million people in the United States, and smallpox, polio, and tuberculosis infected tens of thousands annually, the ability to wash germs off surfaces in homes and other buildings was critically important to public health.  According to public health physicians, lead paints provided washable, durable surfaces

- 17 -

that could substitute for wallpapers, then considered to be a repository of germs and bacteria for infectious diseases.

52.    It was then (as it is today and has been since Greek and Roman times) public knowledge that lead can be toxic if ingested in sufficient quantities over a sufficient period of time.  At that time, sufficient quantities equated to very large quantities by today's standards, as lead poisoning was diagnosed by the presence of symptoms, not by population-based, computer-generated, statistical analyses and epidemiology.  In fact, the toxicity of lead was so well known that it was said in the early 1900's to sound its own warning.  Nonetheless, the prevailing view of public health regulators was that lead pigments could be safely used in interior and exterior paints in schools, homes, and public buildings, because, as everyone knows, paint was not (and is not) a product designed to be ingested, cases of symptomatic lead poisoning in children from ingesting lead paint were very rare and attributed to the psychological condition of pica, and cases of symptomatic lead poisoning in adults were virtually all related to occupational exposures, not the presence of lead paint on building or residence surfaces.  The recommended precaution was to supervise those children with pica carefully to avoid their exposure to lead paint, not to prohibit the use of lead paint in or on private housing or public buildings.

53.    The mere existence of a potentially toxic substance in a consumer product is commonplace.  Any number of products found in homes today contain substances that can be toxic if misused and ingested in sufficient quantities, from bleach to laundry detergent, to toothpaste, to furniture polish.  Unlike some products containing toxic materials, however, Sherwin-Williams did not disguise the use of lead pigments in its paints.  Indeed, the presence of lead was identified on labels because it – the lead – was the very chemical that provided the desirable attributes of the product.  In fact, recognizing the benefits of lead pigment in paint, the

- 18 -

labeling standards of the U. S. Department of Commerce at one time during the 20th century *forbade* calling a product "lead paint" unless it had at least 45% lead pigment. Many state laws contained similar requirements.

54.     Architects, contractors, public decision-makers, and property owners typically selected the type of paint that would be used based on a wide variety of considerations and preferences, including types of color, gloss, surface, durability, price, location, and ease of application and maintenance, among other factors. These persons would have been fully aware that some paints contained lead, that ingestion of too much lead could be dangerous, and that other paints were available, yet they frequently selected lead paints because of their superior durability and performance. Sherwin-Williams never concealed the potential toxicity of lead if ingested. It had no more knowledge about the toxicity of lead than available published medical knowledge, and it labeled its paints since the early 1900s to show their ingredients.

55.     Sherwin-Williams was an innovator and pioneer in making and promoting non-lead paints. From at least the beginning of the 20th century, almost none of Sherwin-Williams' interior paints contained white lead carbonate pigment, the main lead pigment produced during the first half of the twentieth century. Sherwin-Williams researched, developed, made, used, promoted, and sold, as they became technically and commercially feasible, non-lead pigments for use in architectural paints, such as zinc oxide, lithopone, and titanium dioxide. In 1941, Sherwin-Williams invented Kem-Tone water emulsion paint, a durable, non-lead-based, interior architectural paint, for which it received an historical achievement award from the American Chemical Society. Due to the technological developments in paint ingredients during this period, Sherwin-Williams soon became one of the largest sellers of non-lead paints and pigments in the world. By 1937, Sherwin-Williams had stopped using white lead carbonates, one of the

lead pigments traditionally used by master painters and by manufacturers to make many architectural and other paints, in its interior architectural paints, with limited exceptions during WWII due to war-time ingredient shortages. By June 1947, Sherwin-Williams had stopped making white lead carbonate pigments. It ceased manufacturing red lead in 1947 as well.

56.     Despite the availability from Sherwin-Williams and others of non-lead-based paints, the federal government and other public entities, nonetheless, continued to specify and recommend the use of exterior lead-based paints in government projects into the 1970s because of lead paint's proven performance and benefits.

57.     In fact, federal, state, and local government paint specifications played a large role in extending the continued use of lead paints for interior, as well as exterior, use. These specifications were developed over a long period of time and were based on the experience and expertise of, and testing by, government paint chemists, principally those working at the National Bureau of Standards and the Forest Products Laboratory of the U.S. Department of Agriculture. These chemists had strong, independent, published opinions favoring the use of white lead based paints that were drawn from their own experience and testing.

58.     Recognizing the numerous beneficial attributes of lead ingredients in paint, the federal government, throughout at least the first half of the 20th century, frequently specified the use of lead-based paints in government projects, including residential housing projects and schools, even though it knew that lead-based paints could be toxic to children and others if misused, not maintained, and ingested. For example:

- In 1917, the Department of Commerce, Bureau of Standards identified white lead carbonate as "the most important white paint pigment." Circular of the Bureau of Standards, No. 69, Paint and Varnish at 29.

- In March 1920 and July 1922, the Bureau of Standards issued specifications for white paint and tinted paints that were adopted

and used by the federal government for all federal projects. The specifications required a minimum of 45% white lead and a maximum of 70%.

- In 1931, the federal government's master specifications for white paint increased the minimum percentage of white lead from 45% to 60%.

- During the 1930s, the federal government specified white lead in oil for interior uses in housing projects funded by it.

- In the 1930s, the U.S. Departments of Agriculture and Interior recommended the use of white lead for exterior paint, interior flat wall paints, and interior trim of all kinds.

- In 1936, the Bureau of Standards touted basic carbonate white lead as "the most important of the white pigments" and the only white pigment that could be used alone in white linseed oil paints intended for outdoor exposure.

- In 1941, the Navy specified paint containing a minimum of 71% white lead for defense housing projects.

- Through the 1950s, federal government paint specifications called for the inclusion of white lead in exterior paints.

- Throughout these periods, the federal government's paint chemists independently tested and wrote about the many benefits of lead-based architectural paints.

59.     State and local governments often followed federal specifications and recommendations. Indeed, in 1937 the City of Baltimore, whose Health Commissioner brought to the forefront the public health issues of exposure from lead paint on children's toys and furniture and lead in battery casings, chose to switch to the use of white lead based paints in its hospitals and schools. *See* Ex. D (*Baltimore's City Government Specifies White Lead*, LEAD MAGAZINE (1940)) Also, certain industrial maintenance, bridge, marine, and traffic paints that counties and other political subdivisions typically used continued to have lead pigments because of their unique protective and other qualities.

- 21 -

60.     Not until the late 1940s, after Sherwin-Williams had stopped making interior residential paints with white lead, did public health officials discover the public health risks to children from peeling and flaking interior residential lead-based paints.  The discovery was due to an unexpected surge in the number of children with elevated blood lead levels in Baltimore, Maryland.  As soon as it learned of this problem, the LIA sponsored new research and an investigation by physicians at Johns Hopkins University.  This research revealed that the Baltimore children were ingesting deteriorated, interior lead-based paints that their landlords had failed to maintain.  This research was promptly published, and the LIA took steps to alert public health officials across the country to this risk.

61.     The LIA also informed the American Academy of Pediatrics of the newly discovered risk to children from peeling and flaking interior residential lead-based paints.  The American Academy of Pediatrics recommended that the American Standards Association ("ASA") promulgate a national standard to regulate the use of lead-based paints on interior residential surfaces.  In 1955, the ASA issued a voluntary standard, which required that the content of lead in interior paint not exceed one percent "of the total weight of the contained solids (including pigments and drier)."  Sherwin-Williams was an alternate on the subcommittee that proposed the 1955 standard, and was a full member of the subcommittee in 1964.

62.     Public health officials praised the LIA for its full cooperation in facilitating the passage of the 1955 ASA standard.  The LIA and lead-based paint and pigment manufacturers supported not only the 1955 ASA standard, but also federal, state and municipal laws and regulations prohibiting the use of lead-based paints in applications known to be potentially hazardous to children.  Throughout its history, the LIA supported no-strings-attached medical

research at leading medical schools, such as Harvard University and Johns Hopkins University, into the health risks of lead, and that research was published.

63.     Working with the NPVLA and public health officials, Sherwin-Williams helped to draft lead cautions for paints containing lead pigments in the 1950s.  At all times, Sherwin-Williams complied with federal and local laws and regulations regarding the lead content of warnings for lead paints.

### The Unjustified Imminent Lawsuits

64.     Sherwin-Williams is facing the imminent threat of multiple lawsuits in numerous counties across the Commonwealth of Pennsylvania.  Suits have already been filed in Lehigh County and Montgomery County.  Delaware County has retained the same counsel as Lehigh and Montgomery Counties to institute such a suit.  And the same outside attorneys have conferred with Erie and York counties and are actively soliciting other counties to file suit.  *See* Ex. A.

65.     It is likely that the fee agreement between the Defendants and the outside trial lawyers are or will be substantively similar to an agreement struck by the same attorneys and Lehigh County to pursue what appears to be identical litigation.  *See* Ex. B.  Pursuant to that agreement, the outside trial lawyers are authorized to pursue claims against Sherwin-Williams "relating to the County's claims for remediation, declaratory relief, and public nuisance resulting from the manufacturing, marketing, and use of lead paint."  Ex. B at Engagement Letter.  Because the fee agreement does not require the County Solicitor to retain control or supervision over the significant decisions in the litigation, the Counties have effectively and impermissibly delegated their exercise of police power to the private trial attorneys.  For instance, the fee agreement states that the trial attorneys "shall have full power to represent the County in prosecution of the Claims as may appear *to us* to be in the County's best interests subject to

- 23 -

regular and reasonable consultation with the County." *Id.* (emphasis added). The agreement also appears to give the trial attorneys the unilateral power to retain additional outside counsel to aid in the case. *Id.* at 2. And, the outside attorneys are entitled to a 33.3% contingency fee plus expenses. *Id.* at 1.

66.     It is also likely that the Defendants' lawsuits will take a substantively similar form to the complaints already instituted by Lehigh County and Montgomery County at the behest of the same outside trial attorneys. In both Lehigh and Montgomery Counties, the outside attorneys have filed a complaint seeking to impose liability for, *inter alia*, Sherwin-Williams' "manufacture, promotion, propagation, sale, and/or distribution of lead-based paints and pigments" under a public nuisance theory. *See e.g.*, Ex. C at p. 1, ¶ 126.

67.     Sherwin-Williams thus faces the imminent prospect of defending against many lawsuits in different judicial districts throughout the Commonwealth of Pennsylvania. Because these upcoming suits will be filed in many different judicial districts across the Commonwealth, there is a strong likelihood that Sherwin-Williams will be subject to inconsistent or delayed rulings from different trial courts. As a result, the most efficient way to resolve these imminent suits is to have a single federal court issue a ruling uniformly resolving the parties' rights.

68.     A single, authoritative declaration protecting Sherwin-Williams' rights can efficiently and effectively resolve the issues in the existing and threatened suits. Absent such a declaration, moreover, vast judicial, public, and private resources would be squandered as numerous courts would likely be asked soon to decide exactly the same issues.

69.     In a situation like this, where a party faces the twin threats of a number of lawsuits and inconsistent state rulings with federal constitutional rights and other federal

questions involved, this Court can, and should, determine and declare the rights and obligations of that party.

70.     Filing lawsuits, which do not have a legal or factual basis, in order to increase Sherwin-Williams' cost of litigation and either to stifle its exercise of its First Amendment rights or to impose substantial business injury without due process of law, justifies the Court's exercise of jurisdiction here.

71.     The Counties' threatened actions will have a significant negative impact on Sherwin-Williams, its employees, its retirees, and its shareholders, including, but not limited to, the time and resources associated with defending against the unconstitutional litigation and the fluctuations in Sherwin-Williams' share value caused by the Counties' actions.  In addition, the Cities' unconstitutional and illegal actions risk the well-being of countless Sherwin-Williams' shareholders, pensioners, and employees, including the hundreds who live in the Counties.  The negative effects are directly related to the fact that the Counties have chosen to seek to impose grossly disproportionate, retroactive, and unconstitutional liability against Sherwin-Williams.

## COUNT I

### Declaration That the Counties' Claims Violate
### the First Amendment

72.     Sherwin-Williams incorporates by reference the allegations of paragraphs 1 through 71.

73.     The trial lawyers retained by Delaware County and perhaps other counties such as York and Erie seek to instigate numerous lawsuits across Pennsylvania against Sherwin-Williams on behalf of public entities in return for a large contingency fee.  These lawyers will attempt, as other cases have before, to hold Sherwin-Williams liable for:  (i) its membership in the LIA and NPVLA; (ii) the activities of the LIA and NPVLA, including those that Sherwin-

Williams did not join, fund, or approve; (iii) Sherwin-Williams' purported petitioning of federal, state and local governments; and (iv) Sherwin-Williams' commercial speech.

74.     The only factual allegations supporting these extraordinary legal assertions are that Sherwin-Williams was a member of LIA and NPVLA; that it contributed to one program promoting the use of high-quality ready-mixed paints in addition to white lead in oil; that other members funded other LIA activities, including its promotion of lead pigment and paint; that Sherwin-Williams itself also separately promoted the sale of its lead pigments and paints; and that the LIA's lawful promotion of legal products was tortious.  These allegations are insufficient as a matter of law to impose any kind of civil liability on Sherwin-Williams.  Such liability would impair Sherwin Williams' federal constitutional right of freedom of association and speech and would chill product manufacturers including Sherwin-Williams from advertising their lawful products and from joining and participating in trade organizations, which perform many valuable functions.

75.     Because Sherwin-Williams' business was focused on the manufacture and sale of all ready-mixed paints and many non-lead pigments rather than lead paints and pigments in particular, Sherwin-Williams was only a nominal member of the LIA.  Based on historical records, Sherwin-Williams was not active in LIA's business affairs and attended only the first three annual meetings.  Sherwin-Williams was never a member of the LIA's Board of Directors or Executive Committee.  In all of its years of membership from 1928 to June 1947, Sherwin-Williams paid only approximately $17,000 in dues and other contributions.  Sherwin-Williams did not contribute to the LIA's White Lead Promotion campaign, which is a centerpiece of the inaccurate allegations made against Sherwin-Williams in the complaints filed by Lehigh and Montgomery Counties.

76.     No member of an association can be held civilly liable for any wrongful conduct committed by the association or its other members unless the association had unlawful goals *and* the particular member had a specific intent to further those unlawful aims.  Otherwise, the imposition of liability violates the First Amendment of the United States Constitution and Sherwin-Williams' right of freedom of association and speech.

77.     The Counties cannot demonstrate that the aim of LIA or the NPVLA was unlawful.  In addition, they cannot allege that Sherwin-Williams had a specific intent to further some alleged unlawful purpose of either association.  Sherwin-Williams' mere membership in LIA or the NPVLA, its participation in their meetings, and its payment of dues to the LIA or the NPVLA are altogether insufficient to demonstrate that Sherwin-Williams specifically intended to promote unlawful conduct, because these facts could also demonstrate that Sherwin-Williams intended to promote LIA's or the NPVLA's constitutionally-protected activities.  Moreover, mere parallel conduct cannot demonstrate an intentional tortious scheme.  At all times before 1978 during Sherwin-Williams' membership in the LIA and the NPVLA, it was lawful to sell and promote lead-based paints and pigments for certain uses.

78.     In a similar vein, the Counties will likely impermissibly seek to hold Sherwin-Williams liable for it or a trade association exercising its First Amendment right to petition the government and express opinions about its products.  Indeed, this is precisely what the complaints already filed by the trial lawyers in Montgomery and Lehigh counties have sought to do.  *See e.g.* Ex. C at ¶¶ 107, 110, 126.

79.     Sherwin-Williams cannot be liable for statements that it or a trade association made to federal, state, or local legislators or regulators or for its or a trade association's published opinions because those types of statements are constitutionally protected, even if the

statements were later found to be mistaken or untrue. Nor can it be liable for lawful commercial speech. Sherwin-Williams' advertisements were truthful and, as such, are entitled to First Amendment protections.

80. The Counties' threatened lawsuits, if permitted to proceed, would impermissibly chill the free speech and association rights of Sherwin-Williams as well as myriad product manufacturers and trade associations. Sherwin-Williams, like most large companies, belongs to many organizations and associations, even though Sherwin-Williams does not agree with every stated position of these organizations and associations. Sherwin-Williams, moreover, continues to petition local, state and federal governments and continues to speak on matters of public concern. An immediate determination regarding the constitutionality of imposing liability based on Sherwin-Williams' speech activities is necessary to avoid a chilling effect on Sherwin-Williams' current and future constitutionally protected activities.

81. Actual controversies have arisen between the parties entitling Sherwin-Williams to a declaration that it cannot be held liable for First Amendment-protected activities.

## COUNT II

### Declaration That the Counties' Claims Violate
### the Due Process Clause

82. Sherwin-Williams incorporates by reference the allegations of paragraphs 1 through 81.

83. The Counties' lawsuits, if permitted to proceed, would seek to impose on Sherwin-Williams liability (i) that is grossly disproportionate; (ii) arbitrary; (iii) impermissibly retroactive; (iv) without fair notice; (v) impermissibly vague; and (vi) after an unexplainable, prejudicial and extraordinarily long delay, in violation of the Due Process Clause.

84.     The Counties' lawsuits will seek to hold Sherwin-Williams liable by applying today's medical standards to its decades old conduct.  Sherwin-Williams had no knowledge at the time it participated in trade associations in connection with its past manufacture, sale, or promotion of lead pigments and lead-containing paints that the alleged harms at issue today, blood lead levels as low as under five micrograms per deciliter, posed any potential health risk. Medical science was unable to even measure such minute levels of lead at the time.  In fact, at the time that Sherwin-Williams manufactured, promoted, and sold lead pigments, the use of lead pigments in architectural paints was not only lawful, but also encouraged and specified by various cities, states, and the federal government.  Even today, the presence of lead-based paints in housing and public buildings in the Counties is authorized by law.  Sherwin-Williams did not know, and could not have known, that its lawful participation in trade associations, petitioning activities, commercial speech, and manufacture, promotion, and sale of lead pigments and paints could serve as the basis for massive liability decades later.

85.     The Counties seek to hide behind the inherent vagueness of public nuisance law to avoid established bars to product liability and reach a result never before allowed in Pennsylvania.  Public nuisance law does not supplant product liability law.  Even under product liability law, Pennsylvania law does not allocate the duty (or cost) of inspecting, maintaining, or repairing goods after sale to their manufacturers.  The owners of products or properties have a nondelegable duty to ensure that those products and properties are inspected and maintained so that they do not become hazardous.  The Constitution prohibits the Counties from seeking to apply a novel interpretation of unduly vague public nuisance law retroactively to hold liable manufacturers of decades-old products past their useful life.  Again, the imminent threat of such allegations imposes a severe financial hardship on Sherwin-Williams.

- 29 -

86.     The Counties, like Lehigh and Montgomery Counties, will likely try to hold Sherwin-Williams liable for all alleged injuries arising out of all lead-containing paint or exposures to lead, even if Sherwin-Williams did not manufacture the products that caused the injuries.  Indeed, the Lehigh and Montgomery County complaints seek joint and several liability. *See* Ex. C at pp. 38-39.

87.     Permitting Defendants to proceed without allegations or evidence of causation would violate fundamental principles of fairness and notice, amount to the arbitrary imposition of retroactive liability, would result in grossly disproportionate liability, and constitute an unconstitutional deprivation and taking in violation of the Due Process Clause.  For the same reasons, the Counties' lawsuits are based on an application of state law that is unconstitutionally vague.

88.     The Counties' extraordinary and unexplainable delay in bringing their actions, furthermore, is arbitrary and has prejudiced Sherwin-Williams.  Their claims are, and should be held to be, time-barred.  The Counties have known for decades of the potential health risks of lead paint used in the interior of homes and not maintained in an intact condition.  Nonetheless, the Counties waited, for no apparent reason, for over a half century to bring their actions.  In those years, proof of the lead-based products that were used in the housing and public buildings in question has been destroyed, individuals who purchased or applied the lead-based paints have died, evidence concerning the maintenance of the paint has been lost, other witnesses and documents important to Sherwin-Williams' defense have become unavailable, and hazards and costs that could have been avoided have been created.  Yet, the Counties will likely try to use the public nuisance theory to evade the statute of limitations and to excuse their laches.

89.     The imposition of liability on Sherwin-Williams in these lawsuits is so arbitrary and inconsistent with notions of fairness and notice that it would constitute an arbitrary and bad faith exercise of the Commonwealth's police power and an unlawful deprivation and taking of Sherwin-Williams' property by the Commonwealth, in violation of the Due Process Clause.

90.     The immediate and uniform judicial review of the Counties' actions is warranted to ensure stability and the well-being of Sherwin-Williams and its employees, retirees, and shareholders.  If the Constitution were to permit retroactive, severe, and grossly disproportionate liability based upon the future knowledge of the scientific and medical communities, such a decision would disrupt settled expectations and alter many companies', including Sherwin-Williams', business plans, financial reserves, accounting, and overall financial health.  Waiting years for the inevitable inconsistent opinions to work their way through the various trial courts throughout the Commonwealth and the appellate courts would have a detrimental, irreparable effect on Sherwin-Williams and those who depend on it.

91.     Actual controversies have arisen between the parties entitling Sherwin-Williams to a declaration that it cannot be held liable under the Counties' theories consistent with the Due Process Clause.

## COUNT III

### Declaration That the Counties' Contingency Fee Agreements Violate the Due Process Clause

92.     Sherwin-Williams incorporates by reference the allegations of paragraphs 1 through 91.

93.     Based on the agreement between the trial lawyers and Lehigh County, the trial attorneys bringing the Counties' actions stand to garner 33 1/3% of any recovery plus expenses. Ex. B.  Upon information and belief, other Counties have made similar arrangements.  Those

contingent fee agreements are unlawful and violate Sherwin-Williams' due process right to have a financially disinterested public official prosecuting a public nuisance suit brought on behalf of the public.

94.     The Constitution prohibits vesting the prosecutorial function in someone who has a financial interest in using the government's police power to hold a defendant liable.  Indeed, public nuisance is a quasi-criminal tort, which was always a crime at common law.  Public nuisance, moreover, involves balancing a number of factors and interests; merely defining the nature and scope of the public nuisance and determining who should be sued is an inherently discretionary function.  A financial incentive to tip the scales in favor of additional regulation and restriction or toward particular defendants improperly and unconstitutionally impairs a defendant's due process rights.

95.     The unlawful financial incentive given to the trial lawyers demonstrates the danger of allowing the Counties to proceed with their unconstitutional actions.  Although scientific evidence demonstrates that intact lead-containing paints are not a health hazard and need not be abated, the Counties' lawsuits will be based on the presence of lead-containing paint. *See* Ex. C at ¶ 1 ("The continued presence of poisonous, injurious lead paint in hundreds of thousands of residences throughout Montgomery County, Pennsylvania constitutes an ongoing interference with the public health, safety, peace, comfort, and convenience of the citizenry . . . .").  The removal of intact lead-containing paint actually has been shown to create a risk of health hazards to children.  Because of the financial payout, however, the Counties, acting together with their trial lawyers, will include the presence of all lead-containing paint everywhere, including intact lead-containing paint and inaccessible lead-containing paint, within the scope of the alleged public nuisance (including on private properties they do not own) to

increase the size of the potential recovery and to exert financial pressure and injury on Sherwin-Williams. *See* Ex. C at ¶¶ 129-30.

96.     The mere filing of lawsuits by the Counties would have a detrimental effect on Sherwin-Williams and its employees, retirees, and shareholders. Because of the improper financial incentives, the scope of the case is disproportionate and inconsistent with Sherwin-Williams' duties and conduct. Additionally, once these lawsuits are filed, the Counties' financial arrangement with trial attorneys will unlawfully interfere with the Counties' decision-making, including altering their positions or dissuading them from seeking appropriate resolutions to the alleged health hazards with which they are concerned. Sherwin-Williams' rights can be protected only by determining the propriety of using trial lawyers on a contingency fee before a public nuisance action is filed.

97.     The prosecution or filing of a public nuisance action by contingency fee trial attorneys on behalf of the Counties ostensibly to protect the public interest would violate Sherwin-Williams' constitutional rights. Actual controversies have arisen between the parties entitling Sherwin-Williams to a declaration that the Counties cannot hire contingency fee lawyers to pursue actions against private citizens.

**Prayer for Relief**

WHEREFORE, plaintiff, Sherwin-Williams, prays:

(a)     For a judgment declaring and adjudicating the respective rights and obligations of Sherwin-Williams under the United States Constitution and federal law, and further declaring that:

• The Counties cannot, consistent with the First Amendment of the United States Constitution, seek to impose liability on Sherwin-Williams based on (1) its membership or participation in the LIA or any other trade association, (2) its or a trade association's petitioning

- 33 -

of any federal, state or local government agency, (3) its or a trade association's lawful commercial speech, (4) its or a trade association's public expressions of opinion or (5) other activities protected by the First Amendment;

- The Counties' public nuisance claims are arbitrary, impermissibly vague and prejudicially delayed, they seek to impose grossly disproportionate and retroactive liability without fair notice, proof of product identification, or evidence of causation, and would constitute a deprivation and taking of property in violation of the Due Process Clause; and

- The contingency fee agreement proposed by trial lawyers to prosecute against Sherwin-Williams a public nuisance action on behalf of the Counties to protect the public interest is unlawful and violates due process of law;

(b)     For a preliminary and permanent injunction against the Defendants prohibiting each of them from filing or proceeding with any lawsuit or civil action of any kind in violation of this Court's declaration of Sherwin-Williams' rights and obligations;

(c)     For an award to Sherwin-Williams of its costs and expenses, including reasonable attorneys' fees as permitted by 42 U.S.C. § 1988, necessarily incurred in connection with this action; and

(d)     For such further relief as the Court deems just and proper.

- 34 -

Dated: October 22, 2018

Respectfully submitted:

By: _____

William H. Pugh, V., Bar No. 54843
KANE, PUGH, KNOELL,
TROY & KRAMER LLP
510 Swede Street
Norristown, Pennsylvania  19401
Telephone:  (267) 234-1330

Leon F. DeJulius, Jr., Bar No. 90383 (*Pro Hac Vice* Motion to be Filed)
Charles H. Moellenberg, Jr., Bar No. 54740 (*Pro Hac Vice* Motion to be Filed)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania  15219
Telephone:  (412) 391-3939

Jennifer B. Flannery, Bar No. 74546 (*Pro Hac Vice* Motion to be Filed)
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Telephone:  (404) 581-3939

Attorneys for Plaintiff
THE SHERWIN-WILLIAMS COMPANY

- 35 -

# EXHIBIT A



**LEHIGH VALLEY**

# Lehigh County retains firm for lead paint lawsuit

**By:**

Justin Sweitzer  (http://www.wfmz.com/meet-the-team/justin-sweitzer/753079916)

✉ (mailto:sweitzerjt@gmail.com)

**Posted:** Sep 26, 2018 11:26 PM EDT

**Updated:** Sep 26, 2018 11:26 PM EDT



ALLENTOWN, Pa. - The Lehigh County Board of Commissioners narrowly approved a representation agreement Wednesday evening to retain the services of a Philadelphia-based law firm as the county seeks remediation and relief from lead paint manufacturers.

The county will retain the services of Anapol Weiss to represent Lehigh County in a lawsuit that targets Sherwin-Williams Company and other companies that have produced lead paint in the past. The lawsuit is not going after the companies for past harm to individual plaintiffs, but rather for monetary relief to cover the costs of fixing housing units that contain lead paint.

According to Commissioner Nathan Brown, approximately 9,023 homes in the county were built before 1980 and contain lead paint. More than half of those homes – 52 percent – require remediation, or removal of the lead paint, totaling $39 million in cost.

If the suit is successful, the county would use the verdict or settlement money to fund remediation of the homes.

David Senoff, a shareholder with Anapol Weiss, said at the board's Sept. 12 meeting that any money received by the county would be placed into a fund designated for lead hazard control.

"The goal of the litigation would be to remediate going forward," Senoff said at the board's first September meeting. "This is purely to create a fund to be administered by the county so that residents, low-income residents of houses with landlords who own property that have lead paint, ... can come and get a certain amount of money to remediate or do ...  lead hazard control on their properties in order to avoid this from ever happening again."



"The damages are based on the costs that it would take to fix the problem," he added.

Senoff said his firm currently represents other counties in the suit, including Montgomery County and Delaware County.

The county will not pay any immediate fees to Anapol Weiss, but the firm will receive one third of any amount the county would receive from a successful verdict or settlement.

The agreement passed with a 5-4 vote, with one commissioner concerned over a lack of time they had to review the proposal. Another questioned whether it should be the county's responsibility or the state's to seek remediation for homes that contain lead paint.

Commissioner Amanda Holt wanted more time to review the agreement and believed that the board should have investigated other potential options — like low-interest loans — for remediation.

"I think we're kind of rushing into this. We should take more time to review this particular issue," she said. "To me, there's just a whole lot of uncertainty here. There's a lot more to look at, and so for that reason, I do not believe we should move forward with this motion at this time."



Commissioner Percy Dougherty, like Holt, voted against the agreement. He stressed that the state should address issues like lead paint remediation and the opioid crisis.

"The state should be leading the charge in all these cases," he said.

Geoff Brace was one of five commissioners who voted in favor of the agreement.

"Outside of the city of Allentown, there's no remediation being done," Geake said. "I'm willing to make that investment right now, knowing that a generation later there might be public benefit."

"Litigation, as unseemly as it might be in many instances, is a course that we can take," he added.

Brace, Brown, Marc Grammes, Dan Hartzell and Amy Zanelli were the commissioners who voted in favor of the agreement. Daugherty, Holt, Chairman Marty Nothstein and Brad Osborne voted against it.

---

ALL RIGHTS RESERVED. THIS MATERIAL MAY NOT BE PUBLISHED, BROADCAST, REWRITTEN OR REDISTRIBUTED.

ADVERTISEMENT

# Lehigh County demands paint industry help with lead abatement



Delaware, Lehigh and Montgomery counties have agreed to pursue litigation against paint manufacturers, arguing they hold some responsibility to pay for the remediation of lead paint present in thousands of homes in the three counties. (Getty Images)

 By **Tom Shortell**
Of The Morning Call

OCTOBER 1, 2018

N early a century ago, manufacturer Dutch Boy released a coloring book highlighting the virtues of lead paint.

The Dutch Boy's Lead Party, "a paint book for girls and boys," showed the company's mascot painting and playing with lead products.

The paint brand hasn't existed for 40 years. But now, Lehigh County plans to use that coloring book and other ads directed at children as evidence in a lawsuit against the paint industry for peddling a product it knew was toxic.

County commissioners voted 5-4 Wednesday on resolutions to hire the Philadelphia law firm Anapol Weiss to sue in county court some of the world's biggest paint manufacturers, perhaps including ConAgra and Sherwin-Williams.

Unlike class-action lawsuits, the litigation would not seek money for damages people suffered because of the companies' products. Instead, the county intends to argue the paint constitutes a public nuisance and the manufacturers bear responsibility for abating homes with lead paint. The companies marketed the paint to families and children despite knowing the serious health risks their product presented.

By Anapol Weiss' estimate, it would cost $39 million to remove or make safe lead paint in 4,728 Lehigh County housing units. That's how many county homes the firm believes have lead paint and at least one child present. Another 4,300 homes have lead paint but no children living in them, said David Senoff, an attorney and shareholder at the firm.

"Taxpayers could never afford to have this abated," Senoff said. "To attempt it would be a herculean task."

Under the contract approved by commissioners, Anapol Weiss would be paid only if successful in the case, receiving 33 percent of any award. Senoff said he would ask a judge to order paint manufacturers to pay the county's legal fees in addition to any remediation amount.

The lawsuit is based on litigation that has wound its way through the California legal system for 18 years. Raising similar arguments, 10 California cities and counties won $1.15 billion in damages in 2013 against Sherwin-Williams, NL Industries and ConAgra. An appellate court supported most of those findings in 2017, but reduced the damages to $600 million after determining the companies had stopped advertising lead paint for residences by 1950, reducing their liability. The damages were reduced again in September to $409 million.

The case is ongoing in California. NL Industries agreed to a $60.2 million settlement with the plaintiffs in May, but a judge rejected the settlement terms Sept. 18.

Public nuisance laws are the linchpin of such cases. Such laws grant governments the authority to address matters that interfere with the safety, health or welfare of numerous people within a community. In these cases, governments can petition courts to declare the matter a public nuisance and require the responsible party to address it.

In the 1970s, the Pennsylvania Supreme Court ruled an abandoned coal mine in Cambria and Indiana counties was a public nuisance because mine runoff was polluting the Susquehanna River. Although state laws dealing with waterway protection did not require the mine's owner to act, the court ruled the pollution was a public nuisance so the company bore responsibility for the abatement.

Senoff argues paint companies should be held to a similar standard. Companies knew as early as 1904 lead was a serious threat to human health, but continued to use it in their paint for decades. Although they've been barred from selling lead paint to the American public for 40 years, it remains in millions of homes.

"The paint manufacturers were the ones that specifically put the lead into the paint knowing that there were health hazards. They continued to sell it, and they continued to sell it without warning, advertising these kind of products without warning," Senoff said.

Similar cases, however, have failed to gain footholds. Governments in Ohio, Illinois and Missouri filed lawsuits against paint manufacturers, but those cases were dismissed. A case in Rhode Island was initially successful, but then struck down by the state's Supreme Court.

The New Jersey Supreme Court rejected a similar suit in 2008 for a number of reasons, including that lead paint was a matter of consumer protection, meaning individuals, not local governments, had to press the case against paint companies.

Paint manufacturers have presented a host of defenses in these cases that vary depending on the company. Generally, however, the companies have argued that local governments do not have the standing to pursue the cases under common nuisance laws. Even if they do have standing, they argue no one can be held accountable because there's no way to prove whose lead paint is still in the homes.

The companies have also argued the liability lies with property owners since they applied it to their homes and the lack of maintenance is what allows the paint to chip and flake. If left undisturbed, they argued, the paint poses no health risk.

Tony Dias, counsel to Sherwin-Williams, said it was disappointing the counties have pursued litigation, noting the company already contributes millions of dollars to lead poisoning prevention programs. The onus should be on irresponsible landlords who refuse to address the lead hazards in their own properties, he said.

The lawsuits, he contended, would be unsuccessful in Pennsylvania as they have in most jurisdictions, resulting in a waste of time and money for all sides.

"The counties should reconsider this misguided effort, and instead work collaboratively to address problems arising from neglected lead paint in older, poorly maintained homes. Existing laws designed to protect children living in substandard housing, if enforced, would eliminate lead hazards created by the lack of normal and appropriate maintenance," Dias said.

Deborah Maxson, a spokeswoman for ConAgra and Sherwin-Williams, echoed those remarks.

"The companies have always acted responsibly. Litigation does not help the kids. It helps trial lawyers," she said.

The failure of those other cases hasn't stopped Public Citizens of Children and Youth, a Philadelphia nonprofit that advocates for children's health care and education, from latching onto the California ruling as a possible model for Pennsylvania. The Pennsylvania Department of Health says 69 percent of homes in the state were constructed before the federal ban on lead paint in 1978, all but guaranteeing lead hazards remain.

The Valley's average housing unit dates to 1966, and the region's three cities are full of old homes, according to the Lehigh Valley Planning Commission. In Bethlehem, 72.7 percent of the housing stock is more than 50 years old. That figure jumps to 75.6 percent in Allentown and 84.4 percent in Easton, the LVPC found.

Colleen McCauley, PCCY's health policy director, said federal funding to remove or neutralize those lead hazards has dropped over the years. To compensate, the nonprofit has sought other sources of funding, including by suing the paint industry. They recruited Anapol Weiss to take the case, and Montgomery, Delaware and Lehigh counties have signed on for the litigation. Each county would attempt to try its case separately in its county court.

"There has been some success. We've got a partner who's willing to take on the risk to proceed with this case," she said, referring to Anapol Weiss. "We don't feel like we have very much to lose. We'll ... have the court look at the precedent set in California, and we'll roll the dice and see if we can build a strong case here. You don't know until you try," McCauley said.

That desperation for change is driven by the undisputed dangers posed by lead. The federal Centers for Disease Control and Prevention has found lead can cause irreversible damage, ranging from abdominal and digestive issues, lower IQs and fatigue, among a host of other problems.

Young children and infants are at particular risk from lead, which causes developmental delays. Lead paint in homes can flake off walls and be inhaled or fall to the floor as a dust. Small children are especially at risk. No safe blood lead level in children has been identified, according to the CDC.

A 2015 report by the Pennsylvania Department of Health — the most recent report released by the state on the subject — found that 9,643 children under the age of 6 tested positive for elevated levels of lead in their blood. That amounts to about 6.9 percent of all children tested for lead poisoning statewide.

The same report found that 5.7 percent of Lehigh County children in the same age range tested positive for elevated blood lead levels. In Northampton County, 4.9 percent of tested children came back positive.

Getting rid of that paint or making sure it's safely locked away behind layers of nontoxic material isn't cheap. Because even lead paint dust can be dangerous, federal regulations mandate that only specially trained contractors can remove or encapsulate it. Senoff said the average remediation in Lehigh County would cost $8,269 per household.

Ellen Wertheimer, a professor at Villanova University's Charles Widger School of Law, and Mark Rahdert, a professor at Temple University's Beasley School of Law, agreed the counties were pursuing novel arguments untried in Pennsylvania. If successful, the ruling would have enormous ramifications for other companies with products that endangered public health, such as cigarette manufacturers, Wertheimer said.

"I do think [county governments] have a strong argument," she said. "I think they have a very interesting argument that is very worth making."

It remains to be seen if the courts would be willing to entertain the lead paint lawsuits under a public nuisance law, but Rahdert thinks there's a solid case to be made.

"Similar cases of public nuisance have worked for hazardous waste, water pollution, air pollution," he said. "It is not an entirely unusual or unheard of type of claim."

*tshortell@mcall.com*

*Twitter @TShortell*

*610-820-6168*

---

**For The Record**

OCT. 9, 2018, 2:55 PM

---

This article has been updated to reflect recent updates to lead paint litigation in California. Last month, a California Superior Court judge has since reduced the total liability of paint manufacturers from $600 million to $409 million. The same judge rejected a settlement agreement between NL Industries and the municipalities.

Copyright © 2018, The Morning Call

# EXHIBIT B

**COUNTY OF LEHIGH, PENNSYLVANIA**
**RESOLUTION NO. 2018-51**
**SPONSORED BY COMMISSIONER BROWN**
**REQUESTED DATE: SEPTEMBER 5, 2018**

---

**APPROVING A REPRESENTATION AGREEMENT WITH**
**ANAPOL WEISS**

---

**WHEREAS**, §801.1(B) of the Administrative Code of the County of Lehigh (County) requires resolution approval for nonbid professional service agreements over ten thousand dollars ($10,000.00); and

**WHEREAS**, the Department of Administration and the County Solicitor request that the County of Lehigh enter into an agreement with Anapol Weiss to serve as counsel for the County for claims against Sherwin-Williams Company, NL Industries f/k/a National Lead Company.

**NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COMMISSIONERS OF THE COUNTY OF LEHIGH, PENNSYLVANIA THAT:**

1. The proposed agreement for professional services with Anapol Weiss, and the Addendum thereto, marked Exhibit "A" attached hereto and made a part hereof by this reference, are hereby approved.

2. The proper officers and other personnel of Lehigh County are hereby authorized and empowered to take all such further action, including any necessary transfers of funds, and execute additional documents as they may deem appropriate to carry out the purpose of this Resolution.

3. Any resolution or part of resolution conflicting with the provisions of this

resolution is hereby repealed insofar as the same affects this resolution.

    4.    The County Executive shall distribute copies of this resolution to the proper officers and other personnel whose further action is required to achieve the purpose of this resolution.

## ADOPTED BY THE LEHIGH COUNTY BOARD OF COMMISSIONERS

on the _____ day of _____, 2018, by the following vote:

| Commissioners | AYE | NAY |
|---|---|---|
| Geoff Brace | | |
| Nathan Brown | | |
| Percy H. Dougherty | | |
| Marc Grammes | | |
| Dan Hartzell | | |
| Amanda Holt | | |
| Marty Nothstein | | |
| Brad Osborne | | |
| Amy Zanelli | | |

ATTEST: _____
              Clerk to the Board of Commissioners

COUNTY OF LEHIGH CONDITIONS TO REPRESENTATION AGREEMENT

WITH

ANAPOL WEISS

The acceptance by the COUNTY OF LEHIGH ("COUNTY") of the Agreement of ANAPOL WEISS ("PROVIDER"), attached hereto as Exhibit "A", is contingent upon the Agreement including the following conditions pursuant to the COUNTY'S Administrative Code, and the parties hereby agree to do so:

I.      TAXES

A.      The PROVIDER hereby certifies, as a condition precedent to the execution of this contract and as an inducement for the COUNTY to execute same, that it is not "delinquent" on any taxes owed to the COUNTY.  "Delinquent" is hereby defined as the point in time at which the collection of the tax becomes the responsibility of the Lehigh County Tax Claim Bureau.

B.      The PROVIDER further agrees, as a specific condition of this contract, that it shall remain current on all of the taxes it owes to the COUNTY.  Should the PROVIDER become delinquent on any taxes it owes to the COUNTY during the term of this contract, the PROVIDER may be deemed to be in breach of this contract by the COUNTY and, in addition to any other remedies at law for such breach, the PROVIDER hereby specifically agrees and authorizes the COUNTY to apply all funds when due to the PROVIDER directly to the taxes owed to the COUNTY until said taxes are paid in full.

C.      In the event the PROVIDER becomes delinquent, it hereby authorizes the COUNTY to make payments to the taxing authority for the COUNTY to bring the PROVIDER'S county taxes current.

II.     COMPENSATION

The PROVIDER hereto agrees that any and all payments due from the COUNTY as required under the terms of this contract, are contingent upon the availability of the appropriated funds.  If any or all of the funds which are due to the PROVIDER emanate from State or Federal sources, payment is also contingent upon the COUNTY receiving such moneys from the State or Federal Government.

III.    UNDUE INFLUENCE

The PROVIDER agrees not to hire any COUNTY Personnel who may exercise or has exercised discretion in the awarding, administration, or continuance of this contract for up to and including one year following the termination of the employee from COUNTY service.  Failure to abide by this provision shall constitute a breach of this contract.

IV.     OPEN AND PUBLIC PROCESS

Disclosures required by Section 801.5 (Open and Public Process) of the Lehigh County Administrative Code, a copy of which PROVIDER acknowledges has been provided to it.  The PROVIDER shall agree that Contributions will not be made which would render the PROVIDER ineligible to be considered for the contract.  The contract shall require that the PROVIDER disclose any Contribution made by the PROVIDER, sub-contractor or Consultant to any Candidate for Elective County Office or to an Incumbent during the term of the contract and for one (1) year thereafter.  Such disclosures shall be made in writing on a form provided by the COUNTY, and shall be delivered to the COUNTY, within (5) business days of the Contribution.  This COUNTY disclosure form shall be



EXHIBIT

A

delivered by the PROVIDER to the COUNTY contact person identified in the contract, who shall forward copies to the Clerk to the Board of Commissioners, the Controller and the County Fiscal Officer.

## V. NON-DISCRIMINATION CLAUSE

In carrying out the terms of this Agreement, both parties agree not to discriminate against any employee or client or other person on account of race, color, religion, gender, national origin, age, marital status, political affiliation, sexual orientation, gender identity or expression, or physical or mental disabilities as set forth in the Americans With Disabilities Act of 1990. PROVIDER and COUNTY shall comply with the Contract Compliance Regulations of the Pennsylvania Human Relations Commission, 16 Pa. Code Chapter 49, with any pertinent Executive Order of the Governor and with all laws prohibiting discrimination in hiring or employment opportunities.

The provisions of this section must also be included in any sub-contract PROVIDER enters into to perform the scope of this Agreement.

## VI. RIGHT-TO-KNOW

A. PROVIDER understands that this Agreement and records related to or arising out of this Agreement are subject to requests made pursuant to the Pennsylvania Right-to-Know Law, 65 P.S. Sections 67.101-3104, ("RTKL").

B. If the COUNTY needs PROVIDER'S assistance in any matter arising out of the RTKL related to this Agreement, COUNTY shall notify PROVIDER using the legal contact information provided in this Agreement. PROVIDER, at any time, may designate a different contact for such purpose upon reasonable prior written notice to COUNTY.

C. Upon written notification from the COUNTY that it requires PROVIDER's assistance in responding to a request under the RTKL for information related to this Agreement that may be in PROVIDER's possession, constituting, or alleged to constitute, a public record in accordance with the RTKL ("Requested Information"), PROVIDER shall:

1. Provide the COUNTY, within ten (10) calendar days after receipt of written notification, access to, and copies of, any document or information in PROVIDER's possession arising out of this Agreement that the COUNTY reasonably believes is Requested Information and may be a public record under the RTKL; and

2. Provide such other assistance as the COUNTY may reasonably request, in order to comply with the RTKL with respect to this Agreement.

D. If PROVIDER considers the Requested Information to include a request for a Trade Secret or Confidential Proprietary Information, as those terms are defined by the RTKL, or other information that PROVIDER considers exempt from production under the RTKL, PROVIDER must notify the COUNTY and provide, within seven (7) calendar days of receiving the written notification, a written statement signed by a representative of PROVIDER explaining why the requested material is exempt from public disclosure under the RTKL.

E. The COUNTY will rely upon the written statement from PROVIDER in denying a RTKL request for the Requested Information unless the COUNTY determines that the Requested Information is clearly not protected from disclosure under the RTKL. Should the COUNTY determine that the Requested Information is clearly not exempt from disclosure, PROVIDER shall provide the Requested

Information within five (5) business days of receipt of written notification of the COUNTY's determination.

      F.      If PROVIDER fails to provide the Requested Information within the time period required by these provisions, PROVIDER shall indemnify and hold the COUNTY harmless for any damages, penalties, costs, detriment or harm, including attorney's fees, that the COUNTY may incur as a result of PROVIDER's failure , including any statutory damages assessed against the COUNTY.

      G.      The COUNTY will reimburse PROVIDER for costs associated with complying with those provisions only to the extent allowed under the fee schedule established by the Office of Open Records.

      H.      PROVIDER may file a legal challenge to any COUNTY decision to release a record to the public with the Office of Open Records, or in the Pennsylvania Courts; however, PROVIDER shall indemnify the COUNTY for any attorney's fees and costs incurred by the COUNTY as a result of such a challenge and shall hold the COUNTY harmless for any damages, penalties, costs, detriment or harm that the COUNTY may incur as a result of PROVIDER's actions, including any statutory damages assessed against the COUNTY, regardless of the outcome of such legal challenge.  As between the parties, PROVIDER agrees to waive all rights or remedies that may be available to it as a result of the COUNTY's disclosure of Requested Information pursuant to the RTKL.

      I.      PROVIDER's duties relating to the RTKL are continuing duties that survive the expiration of this Agreement and shall continue as long as PROVIDER has Requested Information in its possession.

| COUNTY OF LEHIGH: | ANAPOL WEISS: |
|---|---|
| BY: _____ | BY: _David S. Senoff_ |
| Title: _County Executive_ | Title: _Shareholder_ |
| Date: _____ | Date: _August 28, 2018_ |

Exhibit "A"

# ANAPOLWEISS

David S. Senoff, Esquire
One Logan Square
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
dsenoff@anapolweiss.com
(215) 790-4550 Direct Dial
(215) 875-7733 Direct Fax

August 28, 2018

Phil Armstrong, County Executive
Lehigh County
17 South 7th Street
Allentown, PA 18101

  Re:  Lead Paint Litigation

Dear Mr. Armstrong:

  This letter is to confirm our agreement of representation. You are retaining the firm of Anapol Weiss (hereinafter "the Firm") to represent Lehigh County (hereinafter "the County") in connection with the County's claims against Sherwin-Williams Company, NL Industries f.k.a. National Lead Company, and others (hereinafter "Sherwin-Williams") relating to the County's claims for remediation, Declaratory relief, and public nuisance resulting from the manufacturing, marketing and use of lead paint against Sherwin-Williams (the "Claims"). This letter sets forth the terms of the Contingent Fee Agreement, which applies to our representation.

  It is agreed that the County will pay the Firm a contingency fee of thirty-three and one-third percent (33 1/3%) of the gross amount recovered by way of settlement, verdict or otherwise.

  It is further agreed that the County will reimburse the Firm from its portion of any settlement or verdict all litigation and investigation costs and expenses ("Expenses") incurred in connection with our representation of the County. ("Expenses" are more fully defined below).

  <u>**Should no proceeds be recovered by settlement, verdict or otherwise, the Firm shall have no claim against the County for any services rendered herein or for any expenses incurred.**</u>

  The Firm shall have full power to represent the County in the prosecution of the Claims as may appear to us to be in the County's best interest subject to regular and reasonable consultation with the County, <u>**but in no event shall the suit be settled without the County's expressed consent.**</u>

One Logan Square, 130 North 18th Street, Suite 1600, Philadelphia, PA 19103 I 8700 East Vista Bonita Dr., Suite 268, Scottsdale, AZ 85255
I 1040 Kings Highway North, Suite 304, Cherry Hill, NJ 08034 I Olde Liberty Square, 4807 Jonestown Road, Suite 254, Harrisburg, PA 17109
toll free: 866.735.2792 I www.anapolweiss.com



August 28, 2018
Page -2-

"Expenses" are those costs which relate to the investigation and prosecution of your claim, and include but are not limited to: computerized legal research, expert fees, arbitrators'/mediators' fees, investigators' fees, telephone toll charges, photography costs, court fees, deposition costs, photocopying costs, and any other necessary expenses in this matter, as may be incurred by the County's behalf by the Firm or others in connection with the prosecution of this claim. These Expenses will be reimbursed by the County to the Firm from your portion of any settlement or verdict. These Expenses will be reimbursed by the County in addition to the contingency fee described above.

**In the event any Court orders any defendant in this matter to reimburse the County any amount of money for attorneys' fees or costs (Expenses) of litigation, the amount of money paid by the defendants by way of attorneys' fees or costs will separately be set-off against the gross amount of the contingent fee and the gross amount of all Expenses incurred in connection with the Firm's representation of the County.**

It is understood that the County will give its full cooperation to the Firm in prosecuting this claim or suit. At any time during the prosecution of the County's Claim, the Firm may withdraw its representation of the County in accordance with the Rules of Professional Conduct. If the County discharges the Firm, the County understands that this agreement is meant to bind and benefit the heirs and successors of each of the parties to this agreement. To that end, the County hereby grants the Firm a lien on any claims, causes of action or recovery that the County obtains, whether through settlement, judgment or otherwise relating to the subject of this agreement. The lien will be based upon the amount of our attorneys' fees billed at our then prevailing hourly rates, together with any expenses of the litigation outstanding at the time the County discharges the Firm. <u>This lien will not apply if we withdraw as your counsel purely out of our own choice. This lien only applies in the event the County discharges the Firm prior to any conclusion of this case.</u>

It is understood and agreed that the Firm cannot and has not warranted nor guaranteed the outcome of the case, and the Firm has not represented to the County that the County will recover any funds or compensation. In the event of an unfavorable result, either partially or wholly, the Firm is not obligated to file an appeal on behalf of the County. The County will be advised of the time deadlines for filing or responding to an appeal if such appeal is not to be prosecuted or defended by the Firm.

In retaining the Firm, the County also authorizes the Firm to retain and affiliate with additional counsel in this matter. Our affiliation with all such counsel will be subject to the terms of this agreement, and the County will not be liable for any additional attorneys' fees and expenses other than as stated above, the County has authorized us to associate further counsel should we deem it necessary.

This letter sets forth our entire agreement regarding our representation in connection with this matter. This will confirm that the County through its Executive, has read this agreement and that the Firm has explained this agreement to your complete satisfaction. This agreement shall not be amended nor modified nor any of its provisions waived, unless in writing signed by both the County and the Firm. This agreement supersedes all prior agreements.

August 28, 2018
Page -3-

    If this letter agreement confirms our understanding, kindly sign it and return it to me promptly. I will then sign it on behalf of the Firm and send you a fully executed copy. Should the County have *any* questions about this Agreement, please do not hesitate to contact me.

Very truly yours,

*David S. Senoff*

DAVID S. SENOFF

DSS/cmm

**ACCEPTED AND AGREED TO:**

_____

**Phil Armstrong, County Executive**

Dated: September    , 2018

**CONFIRMATION OF AGREEMENT:**

_____

**David S. Senoff, Esquire**

Dated: September    , 2018

# EXHIBIT C

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

THE COUNTY OF MONTGOMERY

vs.

ATLANTIC RICHFIELD COMPANY

NO. 2018-23539

## NOTICE TO DEFEND - CIVIL

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERENCE SERVICE
MONTGOMERY BAR ASSOCATION
100 West Airy Street (REAR)
NORRISTOWN, PA 19404-0268

(610) 279-9660, EXTENSION 201

PRIF0034
R 10/11

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

THE COUNTY OF MONTGOMERY

vs.

ATLANTIC RICHFIELD COMPANY

NO.  2018-23539

## CIVIL COVER SHEET

State Rule 205.5 requires this form be attached to any document <u>commencing an action</u> in the Montgomery County Court of Common Pleas.  The information provided herein is used solely as  an aid in tracking cases in the court system.  This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.

Name of Plaintiff/Appellant's Attorney:    DAVID S SENOFF, Esq., ID: 65278

Self-Represented (Pro Se) Litigant   ☐

**Class Action Suit**          ☐ Yes      ☒ No

**MDJ Appeal**          ☐   Yes      ☒   No          **Money Damages Requested**  ☒

**Commencement of Action**:                              **Amount in Controversy**:

Complaint                                        More than $50,000

## Case Type and Code

Tort: _____

Other

**Other:**      PUBLIC NUISANCE

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

Montgomery **County**

| For Prothonotary Use Only: |
| --- |
| Docket No: |

*The information collected on this form is used solely for court administration purposes.  This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name:<br>The County of Montgomery | Lead Defendant's Name:<br>Atlantic Richfield Company |
| --- | --- |

**Are money damages requested?** ☒ Yes   ☐ No

Dollar Amount Requested: (check one)   ☐ within arbitration limits   ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☐ Yes ☒ No   **Is this an *MDJ Appeal*?** ☐ Yes ☒ No

Name of Plaintiff/Appellant's Attorney:  David S. Senoff, Esquire

☐ Check here if you have no attorney (are a Self-Represented |Pro Se| Litigant)

**SECTION B**

**Nature of the Case:**  Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.**  If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☒ Other:
  Public Nuisance

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other

- ☐ Other:

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other

- ☐ Zoning Board
- ☐ Other:

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:

*Updated 1/1/2011*

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DAVID S. SENOFF, ESQ. (NO. 65278)
HILLARY B. WEINSTEIN, ESQ. (NO. 209533)
CLAYTON P. FLAHERTY, ESQ. (NO. 319767)
ANAPOL WEISS
ONE LOGAN SQUARE
130 N. 18TH STREET, SUITE 1600
PHILADELPHIA, PA 19103
PHONE: (215) 790-4550
FAX: (215) 875-7733
dsenoff@anapolweiss.com
hweinstein@anapolweiss.com
cflaherty@anapolweiss.com

ATTORNEYS FOR PLAINTIFF

## THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

| | |
|---|---|
| THE COUNTY OF MONTGOMERY<br>1 MONTGOMERY AVENUE<br>NORRISTOWN, PA 19401 :<br> :<br>PLAINTIFF, :<br> :<br>v. :<br> :<br>ATLANTIC RICHFIELD COMPANY :<br>4 CENTERPOINTE DRIVE :<br>LA PALMA, CALIFORNIA 90623 :<br> :<br>AND :<br> :<br>CONAGRA GROCERY PRODUCTS COMPANY :<br>222 W. MERCHANDISE MART PLAZA :<br>CHICAGO, ILLINOIS 60654. :<br> :<br>AND :<br> :<br>E.I. DU PONT DE NEMOURS AND COMPANY :<br>1007 MARKET STREET :<br>WILMINGTON, DELAWARE 19898 :<br> :<br>AND :<br> :<br>NL INDUSTRIES, INC. :<br>5430 LYNDON B. JOHNSON FREEWAY :<br>SUITE #17 :<br>DALLAS, TEXAS 75240 :<br> : | CASE NO. _____<br><br>CIVIL ACTION<br><br>**JURY TRIAL DEMANDED.** |

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00, The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

AND                                        :
                                           :
PPG INDUSTRIES, INC.                       :
ONE PPG PLACE                              :
PITTSBURGH, PENNSYLVANIA 15272             :
                                           :
AND                                        :
                                           :
SHERWIN-WILLIAMS COMPANY                   :
101 WEST PROSPECT AVENUE                   :
CLEVELAND, OHIO 44115                      :
                                           :
             DEFENDANTS.                   :

## COMPLAINT

Plaintiff Montgomery County, Pennsylvania (the "County"), by and through its attorneys, ANAPOL WEISS, hereby brings this civil action seeking relief from Defendants Atlantic Richfield Company ("Atlantic"), ConAgra Grocery Products Company ("ConAgra"), E.I. du Pont de Nemours and Company ("DuPont"), NL Industries, Inc. ("NL Industries"), PPG Industries, Inc. ("PPG Industries"), and the Sherwin-Williams Company ("Sherwin-Williams") (collectively, "Defendants") for the abatement of an ongoing public nuisance and health crisis created by Defendants' decades-long manufacture, promotion, propagation, sale, and/or distribution of lead-based paints and pigments[1] throughout Montgomery County, Pennsylvania. The County avers as follows upon personal knowledge of the undersigned and their own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by its attorneys:

## INTRODUCTION

1.     The continued presence of poisonous, injurious lead paint in hundreds of thousands of residences throughout Montgomery County, Pennsylvania constitutes an

---

[1] As used throughout this Complaint, the term "paint" refers to any liquid composition that converts into a solid film when applied, in a thin layer, to many different surfaces. By contrast, the term "pigment" refers to material that changes the color (or other characteristics) of paint. Both may contain lead.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

ongoing interference with the public health, safety, peace, comfort, and convenience of the citizenry (and, in particular, the welfare of young children living in the County). Although residential lead paints and pigments have been nationally prohibited since 1978, the near-ubiquitous prior use and availability of these noxious materials means that the grave dangers posed by exposure continues to plague Montgomery County to this very day. To safeguard and enforce the public rights of its citizens, the County has brought this civil action for the abatement of lead paint throughout Montgomery County's housing stock. The defendants named herein either played active roles in the proliferation of lead paint throughout Montgomery County, or are the successors-in-interest to participating entities.

## JURISDICTION AND VENUE

2.      This action has been commenced within the original subject matter jurisdiction of the Montgomery County Court of Common Pleas pursuant to 42 P.S. § 931.

3.      Personal jurisdiction is proper in light of the general and specific contacts Defendants maintain with the Commonwealth of Pennsylvania. Defendants regularly and systematically transact business within Pennsylvania pursuant to 42 Pa.C.S. §§ 5322(a)(1)(i)-(v). Thus, personal jurisdiction is properly exercised over Defendants.

4.      Venue is proper in this Court pursuant to PA. R. CIV. P. 1006 as Montgomery County is a county in which Defendants regularly and systematically conduct business and a county in which a substantial part of the events giving rise to the claims occurred.

5.      The County is authorized to file this civil action for the abatement of a public nuisance pursuant to PA. CONST. Art. IX, § 2 and 16 P.S. § 3202(2).

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00, The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## THE PARTIES

### The County of Montgomery (Plaintiff):

6.      Plaintiff, the County of Montgomery, founded in 1784, is a body corporate and politic, political subdivision, and municipality of the Commonwealth of Pennsylvania with its County Seat located in Norristown at the above-listed address.[2]  The County is a Second-Class – A (2-A) County as defined by 16 P.S. § 210(2.1), with a population of approximately 800,000 people making it the third-most populous county in the Commonwealth of Pennsylvania.   Accordingly, the County is a citizen of the Commonwealth of Pennsylvania.

7.      The County contains 62 separate municipalities (or municipal corporations) comprised of various boroughs and townships.  Also contained within the County are 23 separate public school districts, each of which constitute a separate and distinct political subdivision.  Finally, the County also contains some 17 "unincorporated communities."

8.      The median age of the County's housing stock indicates that the majority of residential structures throughout the county were built in 1965, or earlier.[3]  Furthermore, approximately 64.9 percent of the housing in the County was built within one year of the promulgation of the 1978 ban on the sale of lead paint for residential uses, or earlier.[4]

9.      As of 2017, the Montgomery County Planning Commission concluded that the County contains some 325,735 residential structures.[5]  Consequently, approximately 211,402 residential structures (and perhaps many more) throughout the County are

---

[2]  *See, e.g.*, 1 Pa.C.S. § 1991.
[3]  *See, e.g.*, PENNA. FAIR HOUSING FINANCE AGENCY, "Pennsylvania Housing Availability & Affordability Report," (September 2012), at 62, *available at* https://goo.gl/dHSuGj.
[4]  *See, e.g.*, U.S. CENSUS, "PHYSICAL HOUSING CHARACTERISTICS FOR OCCUPIED HOUSING UNITS 2017 American Community Survey 1-Year Estimates," *available at* https://goo.gl/mPw3Wn.
[5]  *See, e.g.*, MONTGOMERY COUNTY PLANNING COMM'N, "Housing Units Built – 2017," *available at* https://goo.gl/rLu2rR.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

implicated by this civil action, as potentially being contaminated by poisonous lead paint as a legal and proximate result of Defendants' conduct.

10.    Contamination as the result of the inevitable breakdown of lead paint throughout the County constitutes an ongoing public nuisance in dire need of abatement.

## DEFENDANTS

### Atlantic Richfield Company ("Atlantic")

11.    Defendant Atlantic Richfield Company ("Atlantic") is a Delaware corporation with its principal place of business located at 4 Centerpointe Drive, La Palma, CA 90623. Atlantic is a corporate citizen of both Delaware and California.

12.    Atlantic is named herein as the successor-in-interest to various corporate entities that manufactured, promoted, propagated, sold, distributed, and/or otherwise caused lead-based paints/pigments to enter the stream of commerce in Montgomery County, Pennsylvania, including the Anaconda Lead Products Company ("ALPC"), the Anaconda Sales Company ("ASC"), and the International Smelting & Refining Company ("IS&R").[6]

13.    Under Pennsylvania law, Atlantic acquired the relevant liabilities related to the lead-based activities of ASC, ALPC, and IS&R upon acquiring IS&R in 1977.

14.    Upon information and belief, Atlantic is the corporate successor to the above-named entities that manufactured, sold, distributed, and/or promoted lead paints/pigments for interior and exterior use in households and public buildings in the County from 1920 through at least 1946.

---

[6] ALPC and IS&R consecutively owned and operated a lead paint and pigment manufacturing plant in East Chicago, Indiana from 1920 until 1946. Under both ownership regimes, the East Chicago plant produced lead-based paints and pigments which were sold under the "Anaconda" brand name. In 1977, IS&R was acquired by and merged into Defendant Atlantic.

5

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

15.     Upon information and belief, Atlantic was a member of the Lead Industries Association ("LIA")[7] from 1928 through 1971, and a member of the National Paint Varnish and Lacquer Association ("NPVLA")[8] from 1933 through 1944.

## ConAgra Grocery Products Company, LLC ("ConAgra")

16.     Defendant ConAgra Grocery Products Company, LLC ("ConAgra") is a Delaware limited-liability corporation with its principal place of business located at 222 W. Merchandise Mart Plaza, Chicago, IL 60654.   ConAgra is a corporate citizen of both Delaware and Illinois.

17.     ConAgra is named herein as the successor-in-interest to various corporate entities that manufactured, promoted, propagated, sold, distributed, and/or otherwise caused lead-based paints and pigments to enter the stream of commerce in Montgomery County, Pennsylvania, including the W.P. Fuller & Company, the W.P. Fuller Paint Company, and WPF, Inc. (collectively, "Fuller").

18.     Fuller established the Pioneer White Lead Works in 1877 and thereafter continued to manufacture, promote, propagate, sell, and distribute various lead-based paints and pigments under the "Pioneer" brand name at all times relevant to this civil action.

19.     Under Pennsylvania law, ConAgra acquired the relevant liabilities related to Fuller's lead-based activities upon acquiring the Beatrice Company in 1993.[9]

---

[7] The LIA was a national, non-profit trade association consisting of commercial producers, purveyors, and consumers of lead-based goods first formed in 1928.  LIA declared bankruptcy in 2002 in response to numerous lawsuits related to its long-term promotion of lead-based products.  It is currently defunct.

[8] The NPVLA is a national, non-profit trade association consisting of paint manufacturers that was first formed in 1887.  Today, it exists as the American Coatings Association ("ACA").

[9] In 1962, W.P. Fuller & Company merged with Hunt Foods and Industries.  Fuller's lead-based paint and pigment operations continued under the ownership of Hunt Foods and Industries.  In 1968, Hunt Foods and Industries consolidated with other corporate entities to form "Norton-Simon."  In 1993, Norton-Simon merged with Beatrice U.S. Food Corporation to form the "Beatrice Company."  Later that same year, the Beatrice Company merged into Hunt-Wesson, Inc.  Finally, in 1999, Hunt-Wesson, Inc. changed its name to "ConAgra Grocery Products Company" ("ConAgra").

6

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00, The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

20.     Upon information and belief, ConAgra is the corporate successor to the above-named entities that manufactured, sold, distributed, and/or promoted lead paints/pigments for interior and exterior use in households and public buildings in the County from 1894 through 1967.

21.     Upon information and belief, ConAgra was a member of the LIA from 1928 through 1958, and was a member of the NPVLA from 1933 through 1962.

### E.I. du Pont de Nemours and Company ("DuPont")

22.     Defendant E.I. du Pont de Nemours and Company ("DuPont") is a Delaware corporation with a principal place of business located at 1007 Market Street, Wilmington, DE 19898.  As such, DuPont is a corporate citizen of Delaware.

23.     DuPont is named herein as: (i) a corporate entity that primarily manufactured, promoted, propagated, sold, distributed, and/or otherwise caused lead-based pigments to enter the stream of commerce in Montgomery County, Pennsylvania; and (ii) as a successor-in-interest to various corporate entities that manufactured, promoted, propagated, sold, distributed, and/or otherwise caused lead-based pigments to enter the stream of commerce in Montgomery County, Pennsylvania, including but not limited to the Harrison Brothers Paint Company and the New England Oil Paint and Varnish Company.

24.     Upon information and belief, DuPont manufactured, sold, distributed, and/or promoted (and/or is the successor-in-interest to entities that acted similarly) lead paints/pigments for interior and exterior use in households and public buildings in the County from 1917 through the 1960s, including under the terms of a contract with NL Industries.

25.     Upon information and belief, DuPont was a member of the LIA from 1948 through 1958, and was a member of the NPVLA from 1933 through 1972.

7

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## NL Industries, Inc. ("NL Industries")

26.     Defendant NL Industries, Inc. ("NL Industries") is a New Jersey corporation with a principal place of business located at 5430 Lyndon B. Johnson Freeway, Dallas, TX 75240.  NL Industries is a corporate citizen of both New Jersey and Texas.

27.     NL Industries is named herein as: (i) a corporate entity that primarily manufactured, promoted, propagated, sold, distributed, and/or otherwise caused lead-based pigments to enter the stream of commerce in Montgomery County, Pennsylvania; and (ii) as a successor-in-interest to various corporate entities that manufactured, promoted, propagated, sold, distributed, and/or otherwise caused lead-based pigments to enter the stream of commerce in Montgomery County, Pennsylvania, including but not limited to the Armstrong & McKelvy Lead and Oil Company, the Carter White Lead Co., and the John T. Lewis & Brothers Co.

28.     Prior to 1971, NL Industries was known as the "National Lead Company," which manufactured, promoted, propagated, sold, and distributed various lead-based paints and pigments, including under the "Dutch Boy" brand name.

29.     Upon information and belief, NL Industries manufactured, sold, distributed, and/or promoted (and/or is the successor-in-interest to entities that acted similarly) lead pigments for use in household paints in the County from 1891 until 1978.

30.     Upon information and belief, NL Industries was a member of the LIA from 1928 through 1978, and was a member of the NPVLA from 1933 through 1977.

## PPG Industries, Inc. ("PPG Industries")

31.     PPG Industries, Inc. ("PPG Industries") is a Pennsylvania corporation with a principal place of business located at One PPG Place, Pittsburgh, PA 15272.  As such, PPG Industries is a citizen of Pennsylvania.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00, The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

32.  PPG Industries is named herein as: (i) a corporate entity that primarily manufactured, promoted, propagated, sold, distributed, and/or otherwise caused lead-based paints/pigments to enter the stream of commerce in Montgomery County, Pennsylvania; and (ii) as a successor-in-interest to various corporate entities that manufactured, promoted, propagated, sold, distributed, and/or otherwise caused lead-based paints/pigments to enter the stream of commerce in Montgomery County, including but not limited to the F.W. Devoe & C.T. Raynolds Company and the Patton Paint Company.

33.  Prior to 1968, PPG Industries was known as the "Pittsburgh Plate Glass Company," and began manufacturing lead-based paints/pigments in 1900.[10]  Beginning in 1900, PPG Industries manufactured, promoted, propagated, sold, and distributed various lead-based paints/pigments, including but not limited to the following brand names: "American," "Crown," "C.F. Lawson & Co.," "Eclipse Silica Lead," "L.R. Strong & Co.," "Le Clede," "Pure," "Patton's B Z Priming Lead," "Patton's Cream City White Lead," "Patton's Princess Paste Paint," "Patton's Strictly Pure White Lead," "Patton's Sun-Proof," and "Red Triangle."[11]

34.  Upon information and belief, PPG Industries manufactured (and is the successor-in-interest to other entities that also manufactured) lead paints/pigments for interior and exterior use in households and public buildings in the County from 1900 through 1978.

35.  Upon information and belief, PPG Industries was also a member of the NPVLA and the LIA at all times relevant to this legal action.

---

[10]  *See, e.g.,* PPG INDUSTRIES, INC., "Company History," *available at* https://goo.gl/HXsthC.
[11]  *See, e.g.,* PITTSBURGH PLATE GLASS CO., "Catalogue A," (1901), *available at* https://goo.gl/a9fU6H.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

### Sherwin-Williams Company ("Sherwin-Williams")

36.     Defendant Sherwin-Williams Company ("Sherwin-Williams") is an Ohio corporation with a principal place of business located at 101 West Prospect Avenue, Cleveland, OH 44115. As such, Sherwin-Williams is a corporate citizen of Ohio.

37.     Sherwin-Williams is named herein as: (i) a corporate entity that primarily manufactured, promoted, propagated, sold, distributed, and/or otherwise caused lead-based paints/pigments to enter the stream of commerce in Montgomery County, Pennsylvania; and (ii) as a successor-in-interest to various corporate entities that manufactured, promoted, propagated, sold, distributed, and/or otherwise caused lead-based pigments to enter the stream of commerce in Montgomery County, Pennsylvania, including but not limited to Acme White Lead and Color Works, Detroit White Lead Works, John Lucas & Company, John W. Masury & Son, the Lowe Brothers Company, Martin Senour, and the Valspar Corporation.

38.     Upon information and belief, Sherwin-Williams manufactured, sold, distributed, and/or promoted (and/or is the successor-in-interest to entities that acted similarly) lead paints/pigments for interior and exterior use in households and public buildings in the County from 1880 through the 1970s.

39.     Upon information and belief, Sherwin-Williams was a member of the LIA from 1928 through 1947 and was a member of the NPVLA from 1933 through 1981.

### FACTUAL BACKGROUND

**A.     The Inherent and Ongoing Health Risks Posed by Lead Paint.**

40.     The scourge of lead has been well-recognized and well-documented even in antiquity, with scholars as early as Hippocrates offering vivid descriptions of the source and

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee =$290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

symptoms of lead poisoning that are all-too-familiar, even in the modern era.[12]  Prior to the federal ban on lead paint in 1978, lead was a key and prevalent ingredient in many types of paints intended (and marketed) for exterior *and* interior residential use.[13]

41.     Interior lead paint erodes over time into chips, flakes, and dust that deposit on floors, window, and other interior surfaces.  Exterior lead paint similarly erodes and contaminates the surrounding soil, which can then be tracked into the homes.  Deterioration is accelerated when lead paint is present on friction surfaces, including doors and windowsills, the normal use of which can cause the paint to degrade more rapidly.[14]

42.     These sources of contamination are particularly dangerous to young children, who normally engage in "hand-to-mouth" behavior as part of their normal development and, thereby, ingest lead-contaminated dust, chips, flakes, soil, and similar particulates.  Younger children can be similarly exposed to existing lead paint when they "mouth" or chew on interior woodwork (again, a normal function of human development).[15]

43.     Lead is particularly hazardous to children and infants, as exposure to lead during their nascent years causes particularly devastating (and permanent) injuries, including learning disabilities, decrements in intelligence and intelligence quotient ("IQ"), and significant disabilities with respect to visual motor skills, fine motor skills, verbal skills, attention/concentration, memory, comprehension, and impulse control.

44.     As the Centers for Disease Control and Prevention ("CDC") have observed:

---

[12]  *See, e.g.*, Milton A. Lessler, "Lead and Lead Poisoning from Antiquity to Modern Times," OHIO J. SCI., 88(3):78-84 (1988), at 79 (describing the symptoms of lead poisoning noted in ancient records as "appetite loss, colic, pallor, weight loss, fatigue, irritability, and nervous spasms," and noting that "cows and horses could not be pastured near the [lead-producing] mines, or they would soon become sick and die") (hereinafter, "Lessler").
[13]  Specifically, "white lead" (a combination of lead carbonate and lead hydroxide), "red lead," and "litharge" (lead oxides).  White lead was widely used as a base for mixing other colored pigments, while red lead and litharge were used both as color pigments and driers in varnish preparations.
[14]  *See, e.g.*, U.S. DEP'T OF HOUSING AND URBAN DEV., "About Lead-Based Paint," *available at* https://goo.gl/2bZefa.
[15]  *See, e.g.*, U.S. DEP'T OF HOUSING AND URBAN DEV., "Learn about Lead," *available at* https://goo.gl/Jffbtc.

11

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Lead is a poison that affects virtually every system in the body. It is particularly harmful to the developing brain and nervous system of fetuses and young children. . . . The risks of lead exposure are not based on theoretical calculations. They are well-known from studies of children themselves and are not extrapolated from data on laboratory animals or high-dose occupational exposures.[16]

45. Exposure to lead in children is generally measured with respect to "blood lead level" ("BLL"), which is typically expressed in micrograms of lead per deciliter of blood ("µg/dL"). "No safe blood level in children has been identified. Even low levels of lead in blood have been shown to affect IQ, ability to pay attention, and academic achievement. And effects of lead exposure cannot be corrected."[17]

46. Any exposure to lead (5 > µg/dL) in children is associated with significantly reduced IQ and academic acumen, inability to problem solve, memory impairment, attention-related disorders, and increases in anti-social behavior. Even "low" BLLs (5-10 µg/dL) are associated with significant, irreversible health consequences, including retardation of development, delayed puberty, decreased growth, diminished hearing, and further increases to anti-social, delinquent, and criminal behavior. Higher levels of exposure (10 < µg/dL) to lead can cause seizures, brain swelling, kidney damage, anemia, disintegration of blood cells, coma, and death.[18]

47. Although the very high BLLs associated with seizures, coma, and death are rarely present in the U.S. today, the grave risk posed by comparatively low BLLs remains:

[E]ven much lower levels, between 3 and 5 µg/dL, can lead to neurologic damage, including impaired memory and executive function, which is the ability to plan, remember instructions, and juggle multiple tasks. Such levels

---

[16] *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, "Preventing Lead Poisoning in Young Children: Chapter 2," (October 1, 1991), *available at* https://goo.gl/kWvt29.
[17] *See, e.g.,* CENTERS FOR DISEASE CONTROL AND PREVENTION, "What Do Parents Need to Know to Protect Their Children?" (May 17, 2017), *available at* https://goo.gl/TtnWwL.
[18] *See, e.g.,* AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, "Lead Toxicity: What Are Possible Health Effects from Lead Exposure?," (June 12, 2017), *available at* https://goo.gl/yuPfs3.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

can lead to decreased IQ and academic performance and can also cause behavioral problems, such as impulsivity, hyperactivity, and attention disorders. Some studies suggest that lead exposure may also cause conduct disorders, depression, anxiety, and withdrawn behavior—the tendency to avoid the unfamiliar, either people, places, or situations.

The mechanisms by which lead causes harm are complex and not completely understood, but one important way it is known to affect children's brains is by mimicking or competing with other metals such as calcium, zinc, iron, and copper. Young children, particularly from birth to age 6, require large amounts of these essential metals for growth and development, especially to build brain cells and send signals throughout the nervous system. The passage of these metals from the blood into the brain is regulated by the blood-brain barrier—a cellular membrane that selectively allows some substances, such as oxygen, immune cells, and nutrients, to pass between the bloodstream and the brain. Lead can masquerade as these essential metals, moving across the barrier, taking the place of important metals in the brain and interfering with the growth of brain cells, which can lead to changes in the way those cells communicate.[19]

48.     The particular risk to children also arises because their bodies cannot effectively counter lead toxicity. Indeed, *any* elevation in BLL may sabotage normal development of the nervous system and physical growth, with potentially devastating, life-long results. The younger a child is when this exposure occurs, the greater the resulting risk:

In adults, approximately 80 to 90% of ingested lead is excreted; the lead that remains may be stored in bone where it does little harm. . . . Both infants and adults have the ability to store lead in bone in an insoluble form, but the more active absorption and small bone mass of infants and children allow them to store only small amounts of lead as compared to adults. Infants and children exposed to toxic levels of lead during their early years show a marked reduction in growth and development. If the exposure is for a prolonged period, they may have peripheral neurological, central nervous system, and kidney damage.

Lead intoxication inhibits the development of red cells in the bone marrow and markedly reduces the synthesis of hemoglobin by developing red blood cells, resulting in an anemia. When children become anemic, it stunts their body growth and the normal development of the nervous system.[20]

---

[19] *See* THE PEW CHARITABLE TRUSTS, *et al.*, "10 Policies to Prevent and Respond to Childhood Lead Exposure," (August 30, 2017), at 8-9, *available at* https://goo.gl/BWJYn4.
[20] *See* Lessler at 82.

13

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

49.     Beyond the terrible individual health consequences, lead poisoning also has a cumulative, deleterious effect by sapping communities (like the County and its constituent city, boroughs, and townships) of well-adjusted, happy, and productive citizens. Nationwide, the American Academy of Pediatrics ("AAP") projects that lead poisoning was responsible for the loss of some 23 million IQ points amongst a 6-year contemporary cohort of American children,[21] in fact, research and evidence suggests that that IQ losses resulting from lead exposure may be **greater** at respectively lower BLLs.[22]

50.     Troublingly, lead poisoning predominantly afflicts children of poverty living in older properties, which results in higher documented BLLs amongst minority children. On the average, minority children have much higher BLLs, with African-American children being the most at-risk population.[23]

51.     The sale of lead paint was prohibited nationwide in 1978 by the U.S. Consumer Product Safety Commission, which explicitly stated that "[t]his action was taken to reduce the risk of lead poisoning in children who may ingest paint chips or peelings."[24] Yet, leading experts are virtually unanimous in concluding that still-deteriorating lead paint in the nation's pre-1978 housing stock remains the primary source of lead poisoning in young children today, including both the CDC[25] and the AAP.[26]

---

[21] *See, e.g.*, Lanphear, et al., "Environmental lead exposure during early childhood," J. PEDIATRICS 140:40-47 (2002).
[22] THE PEW CHARITABLE TRUSTS, *et al*, "10 Policies to Prevent and Respond to Childhood Lead Exposure," (August 30, 2017), at 16, *available at* https://goo.gl/BWJYn4.
[23] *See, e.g.*, Lanphear, et al., "Environmental lead exposure during early childhood," J. PEDIATRICS 140:40-47 (2002).
[24] *See, e.g.*, U.S. CONSUMER PRODUCT SAFETY COMM'N, "CPSC Announces Final Ban on Lead-Containing Paint," (September 2, 1977), *available at* https://goo.gl/hbDM2m.
[25] *See, e.g.*, CENTERS FOR DISEASE CONTROL AND PREVENTION, "Childhood Lead Poisoning," (April 2013), *available at* https://goo.gl/xGtzcY.
[26] *See, e.g.*, AMERICAN ACADEMY OF PEDIATRICS, "Lead Exposure in Children: Prevention, Detection, and Management," PEDIATRICS, Vol. 116, No. 4 (October 2005), at 1037 (*citing* Lanphear, *et al*, "The contribution of lead-contaminated house dust and residential soil to children's blood lead levels. A pooled analysis of 12 epidemiological studies," ENVIRON. RES. 79:51-68 (1998)).

14

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

52.     In recognition of these pressing concerns, in 1995 the Pennsylvania General

Assembly clearly delineated the hazards to children posed by exposure to lead paint:

> (1) Lead poisoning is a significant health hazard to the citizens of this Commonwealth.  Lead poisoning is particularly a hazard to children who typically are exposed to lead through environmental sources such as lead-based paint in housing and lead-contaminated dust and soil.  It is the policy of this Commonwealth to protect the health and welfare of its citizens through reduction of lead in the environment.

> (2) Improper abatement of lead-based paints within this Commonwealth constitutes a serious threat to the public health and safety and to the environment.[27]

**B.     Lead Paint Remains Present Throughout the County's Housing Stock.**

53.     Lead paint and lead poisoning in young children is a grave matter of public

concern and consequence in the County.  The majority of the County's housing stock was

built in or before 1965, and approximately 64.9 percent of the current housing stock was

constructed prior to 1979 (*i.e.*, within one year of the nationwide ban on lead paint, or

earlier).[28]  Furthermore, 39.8 percent of the current housing stock in the County was

constructed in 1959 or earlier, a time period during which lead was most-prevalent in paints

and pigments:[29]

| Years of Construction | 1939 or Earlier | 1940 – 1959 | 1960 – 1979 |
| --- | --- | --- | --- |
| Percent of Housing | 17.4% | 22.4% | 25.1% |

54.     Applying these percentages to the number of residential dwellings identified

in the County by the Montgomery County Planning Commission in 2017 (325,735), the

---

[27]  *See* 35 P.S. §§ 5902(a)(1)-(2).

[28]  This nationwide ban on the use of lead-based paint chronologically lagged quite far behind worldwide trends.  The dangers posed by lead resulted in bans or restrictions on the use of lead-based paints throughout Europe and the Americas, including: (i) France, Belgium, and Austria in 1909; (ii) Tunisia and Greece in 1922; (iii) Czechoslovakia in 1924; (iv) Great Britain, Sweden, and Belgium in 1926; (v) Poland in 1927; (vi) Spain and Yugoslavia in 1931; and (vii) Cuba in 1934.  Even as early as 1922, the Third International Labor Conference of the League of Nations recommended the banning of white lead paint for interior uses.

[29]  *See, e.g.*, U.S. CENSUS, "PHYSICAL HOUSING CHARACTERISTICS FOR OCCUPIED HOUSING UNITS 2017 American Community Survey 1-Year Estimates," *available at* https://goo.gl/mPw3Wn.

15

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

County's housing stock consists of approximately 211,402 buildings constructed within one year of the nationwide ban on lead pigments (1979 or earlier), and approximately 129,643 were constructed during the decades where lead paint is considered most-prevalent in paints and pigments (1959 or earlier).

55.     In a nationwide survey, the U.S. Department of Housing and Urban Development ("HUD") has estimated that roughly 23 million residences contain lead hazards such as deteriorating paint, contaminated dust, and toxic soil, and 3.6 million of these are home to young children.[30]

56.     In particular, HUD noted that the prevalence of lead-based paints/pigments in housing in this area of the county (the Northeast) increases steeply with the respective age of the housing stock. Approximately 23.2 percent of homes constructed between 1960-77 are contaminated, 60 percent of the homes constructed between 1940-59 are contaminated, and 89.3 percent of the homes constructed before 1940 are contaminated.[31]  In slightly broader strokes, the American Healthy Homes Survey estimates that "about 75 percent of pre-1960 homes and 50 percent of pre-1978 homes have lead-based paint and would require abatement."[32] Thus, tens of thousands of dwellings throughout the County are implicated.

57.     In particular, "[r]ental housing built before 1960 that is in poor condition and is occupied by low-income families carries the greatest lead risks. . . .  [I]n communities that have strong policies in place to prevent children from being exposed to lead in rental housing, low-income owner-occupied homes, such as those handed down through

---

[30]  THE PEW CHARITABLE TRUSTS, et al., "10 Policies to Prevent and Respond to Childhood Lead Exposure," (August 30, 2017), at 43-44, *available at* https://goo.gl/BWJYn4.
[31]  U.S. DEP'T OF HOUSING AND URBAN DEV., "American Healthy Homes Survey: Lead and Arsenic Findings," (April 2011) at 20, *available at*  https://goo.gl/4TR6oM.
[32]  THE PEW CHARITABLE TRUSTS, et al., "10 Policies to Prevent and Respond to Childhood Lead Exposure," (August 30, 2017), at 44, *available at* https://goo.gl/BWJYn4.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00, The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

generations, pose the more serious threat." Thus, a comparatively small number of low-income housing structures can account for a disproportionate portion of lead poisoning present within a given community.[33]

58.     Based upon 1999 poverty levels, the U.S. Census identified 11,224 housing structures built before 1980 within the borders of the County that are occupied by impoverished residences.[34] Based upon the above estimates projected by HUD (i.e., the rates of contamination in pre-1980 housing), there are at least 5,881 "high-risk" structures that are in critical and immediate need of abatement to address the risks posed by lead paint hazards.

59.     A report titled "Childhood Lead Poisoning Prevention in Pennsylvania," which was published by the Pennsylvania Department of Health, documents the results of testing of two groups of children for lead poisoning in the County during 2015:[35]

| Ages of Children | Total Tested | % Tested | (5 ≥ μg/dL)[36] | (5 – 9.9 μg/dL) | (10 ≤ μg/dL) |
|---|---|---|---|---|---|
| 0 – 23 Months | 5,009 | 27.74 % | 14 | 124 | 34 |
| 0 – 71 Months | 7,733 | 14.13 % | 33 | 244 | 65 |

60.     Applying this data to the full population of children currently residing in the County reveals that as many as 2,420 children under the age of six years old in the County (and potentially more) have already been irrevocably poisoned by lead as of 2015. Moreover, this data provides a mere snapshot that does not adequately capture the thousands of

---

[33] *Id.* at 39 ("This is largely because most state and local laws permit property owners to re-rent units where a child has been exposed to lead even if the hazards persist.").
[34] U.S. CENSUS, "TENURE BY POVERTY STATUS IN 1999 BY YEAR STRUCTURE BUILT," *available at* https://goo.gl/z3LASt.
[35] *See, e.g.,* PENNA. DEP'T OF HEALTH, "Childhood Lead Poisoning Prevention in Pennsylvania," (2015), at 24, 27, *available at* https://goo.gl/QbaWR3.
[36] The numbers in this category are "unconfirmed," which means that initial testing indicated an elevated BLL, but that a follow-up test was not conducted 12 weeks later. *Id.* at 15.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

children living in the County who have been sickened in past years (or who may be injured in the future by the persistent scourge of lead paint).

61.    Deteriorating lead paint within the pre-1978 housing stock constitutes the primary source of lead toxicity amongst the children living within the County's borders.[37]  As such, lead paint constitutes an ongoing public nuisance to the health, welfare, productivity, and prospects of the County's most-vulnerable citizens that must be abated in the service of the public good.   Furthermore, the nature of this public nuisance is continuous and persistent, beginning with the original use(s) of the lead-based paints/pigments in residential housing throughout the County, through until the present, and into the foreseeable future.

**C.    Abatement is Necessary to Safeguard the Children of the County.**

62.    Given the prevalence and potential for harm of existing lead paint, abatement options have been developed that make it possible to rehabilitate contaminated residential housing, a process which typically begins with the testing of paint, dust, and soil to ascertain the level of contamination in a given structure.  If abatement is determined to be necessary pursuant to the relevant federal standards,[38] long-term steps include permanently covering and/or removing sources of lead paint (*e.g.*, window and door replacement, "stabilization" of lead paint on interior surfaces, removal of soil, *etc.*).  Shorter-term solutions include repairing flaking and peeling paint, and covering soil with grass or mulch.[39]

---

[37] *See, e.g., Lititz Mut. Ins. Co. v. Steely*, 785 A.2d 975, 980 (Pa. 2001) ("[I]ngestion of household dust containing lead from deteriorating lead-based paint is the most common cause of lead poisoning in children.") (*citing St. Leger v. American Fire and Cas. Ins. Co.*, 870 F.Supp. 641, 643 (E.D. Pa. 1994)).

[38] The federal standards defining "paint lead hazard" are drawn broadly and generally include **any** presence of lead-based paint within a home as a hazard in need of some manner of abatement.  77 FED. REG. 1210-11 (January 5, 2001).  "The purpose of identifying almost all deteriorated lead-based paint as a paint lead hazard is to alert the public to the fact that all deteriorated lead-based paint should be addressed—through use of paint stabilization or interim controls." *Id.* at 1211.

[39] THE PEW CHARITABLE TRUSTS, *et al.*, "10 Policies to Prevent and Respond to Childhood Lead Exposure," (August 30, 2017), at 38, *available at* https://goo.gl/BWJYn4.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

63.     In particular, it has been established that "[w]indows have the highest levels of lead paint and dust compared with other building components, and replacing windows [contaminated with] lead paint has been shown to deliver large, sustained reductions in dust lead levels, including on floors that children are likely to contact more frequently."

64.     Although abatement is considered a necessity by the relevant authorities, the costs associated with effective amelioration of lead paint hazards raises cost-based concerns for those households that need it the most (*i.e.*, low-income housing occupants):

> Stakeholders pointed to cost as the single biggest barrier to widespread implementation of lead paint hazard control . . . . At nearly $10,000 per unit, lead paint hazard control is unaffordable for many low- and middle-income Americans. Higher housing costs can have severe consequences for low-income residents if the cost of replacement or abatement is passed on to them. Typical lower-income households spend 40 percent of their income on housing, suggesting many people are vulnerable to even small increases in rents or mortgages. Unaffordable housing can lead to evictions, foreclosures, and homelessness, which can have devastating effects on the health of the family.[40]

65.     Generally, holistic estimates place the average cost of lead paint hazard control at between $8,269 (for pre-1978 housing) to $9,043 (for pre-1960 housing).[41]

66.     However, such expenditures would ultimately yield a **net gain** in overall financial benefits. On a national scale, targeting just the current low-income housing with an estimated 311,000 children (including anticipated births for the next ten years) would cost approximately $2.5 billion, but would yield $3.5 billion in discounted future benefits (including $630 million in savings for the federal government, and $320 million for state and municipal governments).[42]

---

[40] *Id.* at 46–47.
[41] *Id.* These estimates allot $1,000 for testing regimes to determine contamination levels (if any).
[42] *Id.* at 44.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

67.     As set forth in the following paragraphs, Defendants were substantially responsible for the manufacture, proliferation, and promotion of lead-based paints and pigments throughout the County.  As such, it is proper to hold Defendants responsible for the abatement of this dangerous, prolific nuisance.

**D.    Defendants Had Knowledge of The Hazards Posed by Lead When They Helped Place Lead Paint into the "Stream of Commerce."**

68.     At all relevant times, Defendants had actual knowledge that lead-based paints and pigments were (and are) hazardous to human health.  Defendants possessed said knowledge either: (i) primarily, through their own internal research, commercial operations, and/or ; and/or (ii) independently, via their membership and involvement in trade organizations, including but not limited to the LIA and the NPVLA.

69.     Articles documenting childhood lead poisoning widely appeared in academic literature published throughout the United States (and elsewhere), beginning in the mid-part of the Nineteenth Century and gaining momentum through the early Twentieth Century.[43]

70.     On February 24, 1904, Sherwin-Williams published an article recognizing that white lead pigments and paints are "poisonous in a large degree, both for the work-men and for the inhabitants of a house painted with lead colors."[44]  This article recommended that "the absolute disuse of white has become an imperative necessity":

---

[43] *See, e.g.*, Gerald Markowitz & David Rosner, "'Cater to the Children': The Role of the Lead Industry in a Public Health Tragedy, 1900-1955," AMER. J. OF PUB. HEALTH, Vol. 90, No. 1 (January 2000), at 36-37 (collecting publications) ("Cater to the Children"); *see also, e.g.*, David Rosner, *et al.*, "J. Lockhart Gibson and the Discovery of the Impact of Lead Pigments on Children's Health: A Review of a Century of Knowledge," PUBLIC HEALTH REPORTS (May 2005), *available at* https://goo.gl/pAjGPM.
[44] *See, e.g.*, Richard Guenther, "Dangers of White Lead." THE S.W.P., Vol. 6, No. 1 (January 1904), at 102.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

102                     THE S. W. P.

## DANGERS OF WHITE LEAD.

### From Consular Reports.

ERMAN papers state that the French Government is at present considering the question of the use of white lead and other lead mixtures for painting houses. A committee of the Chamber of Deputies has been appointed to investigate the matter, and Mr. Breton, one of the experts, has been authorized to publish the results of this investigation in pamphlet form.

He condemns the addition of white lead to paints and all colors containing it, declaring them to be poisonous in a large degree, both for the workmen and for the inhabitants of a house painted with lead colors. He recommends the use of zinc white instead, which, for surfaces exposed to the sea air, is also much more practical. He expresses the opinion that the absolute disuse of white lead has become an imperative necessity.—*Richard Guenther, Consul-General, Frankfort, Germany, February 24, 1904.*

71.    Even before the publication of this notice, Sherwin-Williams published an article in another internal magazine (*The Chameleon*) in 1900 identifying lead-based paint and/or pigments as a "deadly, cumulative poison," acknowledging that lead-based paint has a "noxious quality" that threatens health because it has a tendency to deteriorate from its surface ("chalking"), and opining that zinc-based paints and/or pigments are both: (i) safer from a health standpoint due to their lack of toxicity; and (ii) more effective than lead from a consumer and practical standpoint.[45]

72.    Despite such actual knowledge regarding the risks associated with lead-based paints and/or pigments, Sherwin-Williams continued to extol and proliferate lead-based paints throughout the County for approximately seven more decades.[46]

73.    As early as January 1912, NL Industries excluded all women and children from its lead-based manufacturing operations due to the recognized risks of lead poisoning. Despite this prohibition, NL Industries (and Defendants) continued to manufacture, extol, and distribute lead pigments and paint.[47]

---

[45] *See, e.g.,* Blanc de Neige, "The Characteristics and Uses of Zinc White," THE CHAMELEON, (1900).

[46] *But cf.* Nadia Pflaum, "Online petition urges Sherwin-Williams to stop making lead paint," PolitiFact, (April 26, 2016), *available at* https://goo.gl/hXKTS2.

[47] *See, e.g.,* NAT. LEAD CO., "Annual Report for Fiscal Year Ending December 31, 1912," at 7-9, *available at* https://goo.gl/1Ldx4S (acknowledging the risks posed by "fumes" and "dust" produced by lead smelting, and assuring that the company employs neither women nor children due to these safety concerns).

21

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

74.     In 1921, NL Industries President Edward J. Cornish conceded in a letter to the dean of Harvard Medical School that after "fifty to sixty years" of experience, he had concluded that it was general knowledge within the industry that "lead is a poison when it enters the stomach of man—whether it comes from the orders and mines and smelting works," or from other lead-based derivatives (such as those used in pigments and paints).[48]

75.     At all relevant times, both the LIA and the NPVLA were agents, servants, employees, alter egos, co-conspirators, and/or abettors of Defendants, whether acting independently or within the scope of agency, servitude, employment, and/or conspiracy.

76.     In a July 11, 1939 meeting and a confidential letter sent on July 18, 1939, the NPVLA advised its members in certain terms regarding the toxic nature of lead paints and pigments (particularly, although not exclusively, in the context of "children's toys, equipment, furniture, etc."), and the need to safeguard the public.  The confidential letter also contained a warning that any "manufacturer who puts out a dangerous article or substance without accompanying it with a warning as to its dangerous properties is ordinarily liable for any damage which results from such a failure to warn."

77.     However, Defendants failed to heed this warning, and instead embarked upon a propaganda campaign to dissuade the public regarding the well-established, and inherent health risks posed by lead-based paints and pigments during the 1930s.  Upon information and belief, the LIA assisted Defendants in both disregarding these warnings and concealing this knowledge from the public.

78.     In a 1955, LIA's Director of Health and Safety Manfred Bowditch explained the scourge of childhood lead poisoning in denigrating terms as an educational and financial issue (despite Defendants' and the LIA's active concealment of these health risks):

---

[48] *See, e.g.*, Cater to the Children at 36.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM. Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

> Childhood lead poisoning is common enough to constitute perhaps my major "headache," this being in part due to the very poor prognosis in many such cases, and also to the fact that the only remedy lies in educating a relatively ineducable category of parents. It is mainly a slum problem with us, . . . and as we have no monopoly on either substandard housing or substandard mentalities in the USA.[49]

79.     Upon information and belief, an LIA Quarterly Report issued in 1958 equally emphasized the rising issue of childhood lead poisoning, noting that a missive from the Baltimore Commission of Health indicates that "the outlook is bleak" in the context of childhood lead poisoning as "[t]here may be permanent brain damage and paralysis, and the child becomes a life-long drain on the family, if it can bear the expense and the mental stain, or on the community."

80.     Upon information and belief, the LIA callously stated in the same report that "the doings of slum children in our eastern cities may seem of little consequence."  Overall, however, the report evinces a clear understanding of the nature of childhood lead poisoning:

> Childhood Lead Poisoning – This seemingly unending problem of lead poisoning in small children, mainly confined to the slums of our older cities, is a continuing study and preventive effort. . . .  [I]t must be bourne in mind that every such case is a potential source of damaging publicity, and that many of the surviving children may be permanently mentally retarded.

81.     Indeed, the LIA was clearly and fully aware of the consequences and issues posed by childhood lead poisoning, as evinced by the comments of Director Bowditch during an April 24-25, 1957 meeting: "The major source of trouble is the flaking of lead paint in the ancient slum dwellings of our older cities, [and] the problem of lead poisoning in children will be with us for as long as there are slums."  At the same meeting, Bowditch acknowledged that "the overwhelmingly major source of lead poisoning in children is from

---

[49] See, e.g., Richard A. Oppel, Jr., "Rhode Island Sues Makers of Lead Paint," THE NEW YORK TIMES, (Oct. 14, 1999), available at https://goo.gl/uKdWGm.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

structural lead paints chewed from painted surfaces, picked up or off in the form of flakes, or adhering to bits of plaster and subsequently ingested."

82.     Upon information and belief, Defendants were fully aware, cognizant, and informed regarding the LIA's various communications regarding the health risks of lead Overall, Defendants should have been (and actually were) fully aware that lead paints and pigments were (and are) hazardous to human health and childhood development.

**E.      Defendants Manufactured, Distributed, and Promoted Lead-Based Paints and/or Pigments Throughout the County.**

83.     Despite the aforementioned knowledge, Defendants continued to manufacture, distribute, and promote lead-based paints and/or pigments.  In particular, many Defendants maintained lead-related facilities in close proximity to the County.

84.     Upon information and belief, Sherwin-Williams owned and operated the Gibbsboro Paint, Color, and Varnish Works in Gibbsboro, NJ until its closure in approximately 1978 (and which Sherwin-Williams originally obtained via its 1930 acquisition of John Lucas & Co.) approximately 30 miles from the County.

85.     Upon information and belief, Sherwin-Williams: (i) maintained and operated additional facilities in the Commonwealth (or in close proximity to the Commonwealth) devoted to lead paint; and (ii) utilized these facilities to manufacture and distribute lead paints and/or pigments in the County.

86.     DuPont owned and operated the Gray's Ferry and Kensington White Lead, Color & Chemical Works in Philadelphia, PA through the 1950s (and which DuPont

24

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

originally obtained via its 1917 acquisition of Harrison Brothers & Co.) approximately 30 miles from the County.[50] These facilities were also referred to as "Marshall Laboratory."

87.     Upon information and belief, DuPont: (i) maintained and operated additional facilities in the Commonwealth (or in close proximity to the Commonwealth) devoted to lead paint; and (ii) utilized these facilities to manufacture and distribute lead paints and/or pigments in the County.

88.     NL Industries (and its corporate predecessors) owned and operated the Philadelphia Lead Works (and related factory operations) in the Kensington neighborhood Philadelphia, PA for approximately 150 years (and which NL Industries originally obtained via its acquisition of the John T. Lewis & Brothers Co.) approximately 30 miles from the County.[51/52]

89.     NL Industries also owned and operated the Keystone Lead Works in Pittsburgh, PA at all times relevant to these claims (and which NL Industries originally obtained via its acquisition of the Armstrong & McKelvy Lead and Oil Company).

90.     Upon information and belief, NL Industries: (i) maintained and operated additional facilities in the Commonwealth (or in close proximity to the Commonwealth) devoted to lead paints and/or pigments; and (ii) utilized these facilities to manufacture and distribute lead paints and/or pigments in the County.

91.     PPG Industries (and its corporate predecessors) owned and operated various "Paint and Varnish Plants" throughout the U.S. and/or in close proximity to the

---

[50]   *See, e.g.,* "E.I. du Pont de Nemours Company," WORKSHOPS OF THE WORLD, *available at* https://goo.gl/FJ6nPB.

[51]   *See, e.g.,* Alison Young, "More evidence children harmed by lead near Philadelphia 'Ghost Factory,'" USA TODAY, (October 12, 2015), *available at* https://goo.gl/Lo6b2T.

[52]   *See, e.g., Zbirowski v. J.T. Lewis Bros. Co.,* 196 A. 606, 611 (Pa. Super. 1938) (identifying John T. Lewis & Brothers Co. as "a subsidiary of the National Lead Company").

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Commonwealth, including lead manufacturing operations at: (i) Newark, New Jersey; (ii) Milwaukee, Wisconsin; and (iii) Red Wing, Minnesota.[53]

92.  Upon information and belief, PPG Industries: (i) maintained and operated additional facilities in the Commonwealth (or in close proximity to the Commonwealth) devoted to lead paints and/or pigments; and (ii) utilized these facilities to manufacture and distribute lead paints and/or pigments in the County.

93.  Upon information and belief, Atlantic and ConAgra (and/or their corporate predecessors): (i) maintained and operated facilities in the Commonwealth (or in close proximity to the Commonwealth) devoted to lead paints and/or pigments; and (ii) utilized these facilities to manufacture and distribute lead paints and/or pigments in the County.

**F.     Defendants Falsely Advertised That Lead-Based Paints and Pigments are Safe and Effective.**

94.  Defendants also undertook concerted marketing efforts via magazines and other periodicals to widely: (i) advertise and misrepresent the efficacy and illusory safety of lead-based paints and pigments; and (ii) omit, obfuscate, or conceal the life-threatening health hazards posed by lead paint.  In particular, these advertisements extolled the benefits of using lead-based paints and pigments for toys, interiors and exteriors of homes, playgrounds, schools, hotels, hospitals, and office buildings.

95.  NL Industries (then operating as "National Lead") widely advertised (particularly with regards to its "Dutch Boy" line of products).  In its own published magazine—*The Dutch Boy Painter*—NL Industries regularly claimed that its white lead paint was safe, sanitary, and superior to other alternatives.  This advertisements included statements such as: (i) "White lead is invaluable in assuring comfort and proper sanitation, its

---

[53]  *See, e.g.*, PITTSBURGH PLATE GLASS CO., "Glass, Paints, Varnishes and Brushes: Their History Manufacture and Use," at 258-59 (1923), *available at* https://goo.gl/`LQ8fV1.

best-known and most widespread use is as white lead in paint;" (ii) "If a wall is covered with a good water proof coat of . . . white-lead-oil, its smooth surface is easily washed and never need afford a resting place for germs;" (iii) "In short, we recommend pure lead paint without reservation as a safe, time-tested paint to use on your home;" and (iv) "Remember, also, that the more white-lead you use, the better the paint."[54]

96. Of particular note, during the 1920s NL Industries specifically manufactured and distributed advertising materials regarding lead-based paint that explicitly targeted children through the use of their popular, spritely "Dutch Boy" mascot:



97. NL Industries's first children's booklet was published in 1923:

---

[54] *See* Gerald Markowtiz & David Rosner, "Deceit and Denial: The Deadly Politics of Industrial Pollution," (Oct. 10, 2002), UNIV. OF CALIF. PRESS, at 80-85 ("Deceit and Denial").

27

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



98.     This advertisement explicitly extolled the use of lead-based paint to children:



99.     NL Industries published other "paint books" advertising lead-based paints and/or pigments that explicitly targeted children by grossly misrepresenting the use of lead-based paints and/or pigments as safe, fun, and normal:



Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

100.    Of particular note, the NL Industries also produced *The Dutch Boy Conquers Old Man Gloom: A Paint Book for Boys and Girls*, a publication that explicitly promoted the use of lead-based paint in children's rooms, depicting the Dutch Boy mixing white-lead paint into various colors to paint walls and furniture:



101.    The advertisement included an illustrated rhyme.  The first two panels depict a despondent boy and girl (and include a direction for the children to provide an included coupon to their parents, to facilitate the purchase and use of NL Industries lead-based paints and/or pigments):



102.    However, the children quickly catch sight of the NL Industries' Dutch Boy Painter, and plead for their parents to allow them to seek his "help."  The Dutch Boy assures

29

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the family that he can fix their "problem" with some lead paint. As might be expected, the application of NL Industries' lead-based paint saves the day:



103.   Along similar lines, NL Industries suggested (falsely) that lead-based paints and pigments are benign and safe in an advertisement titled "Takes a Scrubbing With a Smile," which depicted a naked child in a bathtub scrubbing himself while an open can of Dutch Boy paint sits in easy reach upon the floor:



104.   NL Industries also published an advertisement titled "Finger Prints" depicting a crawling infant touching and smudging a "wall painted with Dutch Boy white-

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

lead." Although the explicit message of this advertisement is that lead-based paint is easy to clean, the *implicit* message is that lead paint is safe for children. Moreover, this advertisement explicitly (and implicitly) unintentionally acknowledges the ongoing threat to the children of the County posed by Defendants' products:[55]



105.    Even in 1949, NL Industries remained steadfastly cognizant (and even proud) of its efforts to target children, noting in its own sales manual as follows:

> The appeal is particularly strong to children and the company has never overlooked the opportunity to plant the trademark image in young and receptive minds. One of the most successful promotions for many years was a child's paint book containing paper chips of paint from which the pictures (including, of course, several Dutch Boys) could be colored.[56]

106.    Beyond these explicit efforts to target children with advertisements for lead paints and pigments, NL Industries also simultaneously published advertisements that (falsely) claimed that lead paint possessed "healthful" qualities, including: (i) an advertisement published in *National Geographic* in November 1923, titled "Lead Helps to Guard Your Health," promoting the ridiculous notion that "lead helps to guard your health;"

---

[55] *Id.* at 79.
[56] *Id.* at 80.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

and (ii) advertisements titled "Clean and Bright Hospital Walls" (published in the July 1921 issue of *The Modern Hospital* magazine) and "Color-the Doctor's Assistant" (published in the July 1922 issue of *The Modern Hospital* magazine), which referred to NL Industries' lead paint as "the doctor's assistant" and claimed that it "does not chip, peel, or scale," and that "[e]very room in a modern hospital deserves a Dutch Boy quality painting job."



107.    Upon information and belief, Sherwin-Williams undertook similar advertising activities, including but not limited to: (i) a 1922 advertisement encouraging the use of lead paint on children's toys;[57] (ii) a 1924 advertisement containing testimonials from a "Cousin Susie" who claimed that "her health improved instantly after painting her home with lead-containing paints;"[58] and (ii) a 1936 advertisement representing the use of lead-bearing "semi-Lustre" paints as being unsurpassed for use in nurseries, recreational rooms, and similar interior surfaces.

---

[57] *See, e.g.,* Thomas C. Galligan, Jr., *et al.,* "Tort Law: Cases, Perspectives, and Problems," LEXISNEXIS, (Oct. 26, 2007), at 267-68.
[58] *See, e.g.,* Lilly Fowler, "How the Paint Industry Escapes Responsibility for Lead Poisoning," MOTHER JONES, (August 8, 2013), *available at* https://goo.gl/oH1NLX.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

108.    Sherwin-Williams is also the successor-in-interest to corporate entities that utilized advertisement to promote lead-based paints and/or pigments while minimizing, trivializing, or obfuscating the inherent health risks of such materials:



109.    Defendants (including NL Industries and DuPont) also propagated advertisements that falsely claimed that lead-based paints and/or pigments were superior and, therefore, a better economic choice for thrifty consumers:



**G.    The LIA Undertook Similar Campaigns of Misinformation Regarding Lead-Based Paints and Pigments in Collusion With Defendants.**

110.    Upon information and belief, the LIA cooperated with, conspired amongst, and otherwise assisted and acted as an employee, representative, agent, and/or servant of

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00, The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Defendants in the pursuit and proliferation of similar campaigns of disinformation regarding the characteristics, risks, and efficacy of lead-based paints and/or pigments.

111.    Upon information and belief, at all relevant times the LIA operated at the behest of, under the direction of, and for the pecuniary interests of Defendants:

> [D]espite the growing evidence of lead's toxic effects on children, during the 20th century the Lead Industries Association aggressively promoted lead as a superior product while downplaying public health risks and undercutting large-scale regulatory efforts.  Notably, the industry developed model building codes for lead in plumbing and paint and successfully lobbied for their adoption by federal, state, and municipal governments.[59]

112.    In the early 1930s, the LIA published and disseminated a book titled *Useful Information About Lead* suggesting that any "prospective paint user" should seek out paints with the highest possible concentrations of lead because "the higher the better."  Although this book purported "to disseminate accurate information regarding lead products and how they best may be used," the LIA's publication contained no warnings whatsoever regarding the inherent dangers of lead poisoning.  The publication also included a section titled "White Lead in Paint," claiming that "well painted buildings, both inside and out, go hand in hand with improved sanitation," and that "[w]hite lead paint is widely used for home interiors."[60]

113.    The LIA was also the conduit through which Defendants launched the "White Lead Promotion Campaign" in 1938.  In a February 20, 1939 letter from LIA Secretary Felix Wormser, it was freely acknowledged that this campaign was undertaken with the explicit recognition that "white lead is . . . constantly subject to attack from the health standpoint."  Minutes from an October 20, 1941 LIA meeting confirm that this promotional

---

[59] THE PEW CHARITABLE TRUSTS, *et al.*, "10 Policies to Prevent and Respond to Childhood Lead Exposure," (August 30, 2017), at 5, *available at* https://goo.gl/BWJYn4 (internal footnotes omitted).
[60] *See, e.g.*, LEAD INDUSTRIES ASSOC., "USEFUL INFORMATION ABOUT LEAD," (January 1, 1931), *available at* https://goo.gl/GL9rqW.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00, The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

campaign was launched "to offset the stigma attached to lead because of attacks made upon it by consumer organizations" and "help to dispel fear or apprehension about its use."

114.    As part of this campaign, the LIA took the following actions in concert with and on behalf of Defendants: (i) published articles in its own magazine, *Lead*, in 1938 and 1939 promoting an economic rationale for the use of white lead paint in low-cost housing; (ii) sending at least two representatives (Seldon Brown and W.L. Frazee) to visit hundreds of public and private institutions (*e.g.*, neighborhoods, government offices, public schools) to press for the use of white lead paint for exterior and interior surfaces; and (iii) undertook a massive print advertising campaign in national publications including *Saturday Evening Post*, *Colliers, American Home, Country Gentlemen,* and *Better Homes and Gardens* comprising some 67,570,526 placements.[61]

115.    LIA Secretary Wormser explicitly stated in 1940 that this campaign had succeeded in deflecting growing concerns regarding the effects of lead upon human health:

> One beneficial result of our campaign is the good will it is building for lead in general.  I have always felt that the cultivation of good will for our metal and publicity about the indispensable work it does for mankind is something that lead needs more than other common metals because lead in many forms is constantly under attack on account of its toxic qualities.[62]

116.    Upon information and belief, all Defendants undertook similar collaborative and/or individual efforts to: (i) manufacture, promote, propagate, sell, and/or distribute lead-based paints and pigments; and (ii) obfuscate, misrepresent, or omit the inherent health-based dangers posed to children by Defendants' lead-based products.

---

[61] *See, e.g.*, Cater to the Children at 41-42.
[62] *Id.* at 42.

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

117.    In so doing, Defendants created and proliferated a public nuisance throughout the County which endures to this day and requires abatement in order to safeguard the health and welfare of the public (in particular, children).

118.    Upon information and belief, at all relevant times Defendants targeted the County with their marketing and distribution efforts regarding lead paints and pigments.

119.    Because the County is seeking to enforce and protect existing public rights, statutes of limitation are inapplicable to these claims pursuant to the doctrine of *nullum tempus occurrit regi* ("no time runs against the king") under Pennsylvania law.[63]

## COUNT I

## PUBLIC NUISANCE:

120.    Plaintiff incorporates herein by reference all other paragraphs of this Complaint as if fully set forth at length.

121.    Although Defendants' direct conduct in propagating, promoting, and disseminating lead-based paints and pigments was effectively stopped in 1978, Defendants' conduct has produced a long-lasting, detrimental, and deleterious effect upon the public rights enumerated above due to the continuing health risks posed by the lead paint that remains in the older housing stock throughout the County.

122.    Furthermore, the continued presence of lead paint and pigments throughout the County has caused, is currently causing, and will continue to cause significant harm to the citizens and children of the County, which far outweighs any arguable social utility.

---

[63] *See, e.g., Com., Dep't of Transp. v. J.W. Bishop & Co., Inc.*, 439 A.2d 101, 104-05 (Pa. 1981) ("Whatever inconveniences defendants may experience, that inconvenience is outweighed by the sound policy of vindicating public rights and protecting public property which underlies the doctrine of *nullum tempus occuritt regi*.") (*quoting Commonwealth v. Baldwin*, 1 Watts 54, 54-55 (Pa. 1832) ("[W]here the maxim *salus populi suprema lex* ("the welfare of the people is the supreme law") is the predominant principle of a government, to whose operations and well-being is as essential as to those of a monarchy?  The necessity of it, in regard to statutes of limitations, is peculiarly apparent.")).

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00, The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

123.  The lead paint and pigments still present throughout the County as a result of Defendants' conduct discussed above in this Complaint pose a past, present, and ongoing risk of lead poisoning to the citizens of the County (and, in particular, children).  As such, these actions have (and continue to) significantly and materially interfere with the individual and collective rights of the citizens of the County, including the public health, safety, peace, comfort, and convenience of the citizenry.  In particular, the citizens and children of the County have a common right to be free from the detrimental effects of exposure to lead paints and pigments in, on, and around their private homes and residences, and the public buildings and property throughout the County.  As such, lead paint and pigments constitute a public nuisance under the common law of Pennsylvania.

124.  Furthermore, the Pennsylvania General Assembly has explicitly and/or implicitly declared that lead paint is a public nuisance pursuant to 35 P.S. §§ 5902(a)(1)-(2).

125.  In addition to the inherent authority of the County to enforce the public rights of its citizenry under the common law and Sections 5902(a)(1)-(2), this legal action is also authorized pursuant to 35 P.S. § 5910(d)(4), which authorizes the "initiation of legal action or proceeding in a court of competent jurisdiction" if Defendants have violated a regulation promulgated under the Lead Certification Act.

126.  Defendants are liable for the abatement of this public nuisance because they were (and are) responsible for creating, contributing to, assisting in the creation of, and/or being a substantial contributing factor in the genesis and perpetuation of this public nuisance as described throughout this Complaint, including (but not limited to) by:

   a.  Misrepresenting, obfuscating, or failing to disclose the well-known health hazards associated with exposure to lead-based products like paints and pigments;

   b.  Making false claims regarding the "benefits" of lead-based paints and pigments;

37

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

c. Manufacturing, promoting, and/or selling lead-based paints and pigments throughout the County and Pennsylvania for use on the exteriors and interiors of residential and public buildings, and on furniture and children's toys, despite definitive evidence of the well-known health hazards associated with exposure to lead;

d. Engaging in massive, concerted and/or individual campaigns to promote the wider use of, and market for, lead-based paints and pigments;

e. Engaging in massive, concerted and/or individual campaigns to prevent and/or forestall the passage of regulations and restrictions on the sale and use of lead-based paints and pigments; and

f. Engaging in massive, concerted and/or individual campaigns to discredit existing evidence regarding the health hazards posed by lead-based paints and pigments.

127.    Defendants' conduct is a direct, legal, and proximate cause of the public nuisance currently afflicting the County and its citizens.

128.    The lead paint currently contaminating homes and buildings throughout the County is present as a direct and proximate result of Defendants manufacture, promotion, distribution, and sale of lead-based paints and pigments.

129.    The inevitable deterioration of these noxious materials has, is, and will continue to occur for the foreseeable future as a result of Defendants' actions, thereby exposing large numbers of the County's citizens (and, in particular, children) to the resulting permanent injuries caused by lead and discussed throughout this Complaint.  This exposure will have an ongoing deleterious effect upon the health, safety, and welfare of those same people (as well as their communities, at-large).

130.    As such, Defendants are liable for the abatement of this public nuisance from all public and private homes and properties throughout the County.

**WHEREFORE**, the County respectfully requests that this Court enter a judgment against Defendants, individually, jointly, severally, and jointly and severally, and prays for the

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

following relief: (i) abatement of the above-described public nuisance throughout the County; (ii) the entry of an order enjoining any future illicit conduct by Defendants; (iii) legal costs of these proceedings; (iv) attorneys' fees; and (v) all other relief that this Court may deem necessary.

## COUNT II

## DECLARATORY JUDGMENT

131.    Plaintiff incorporates herein by reference all other paragraphs of this Complaint as if fully set forth at length.

132.    Plaintiffs seek declaratory relief pursuant to 42 Pa.C.S. § 7533, which provides as follows:

> Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise, and obtain a declaration of rights, status, or other legal relations thereunder.

133.    Instantly and under the identical rationales expressed above, the County contends that the actions of Defendants have created and contributed to a public nuisance that was explicitly and/or implicitly identified pursuant to the General Assembly's legislative findings. *See, e.g.,* 35 P.S. §§ 5902(a)(1)-(2) (identifying lead as a "significant health hazard to the citizens of this Commonwealth" and particularly the health of children, who are typically exposed through "lead-based paint in housing and lead-contaminated dust and soil").

134.    As such, the County's rights are interested in, affected by, and contemplated by this legislative determination, which also makes clear that it is the policy of the Commonwealth government "to protect the health and welfare of its citizens through reduction of lead in the environment." *See, e.g.,* 35 P.S. § 5902(a)(1).

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

135.     Declaratory relief is appropriate because: (i) there is a real, actual, and substantial controversy in which claims have been asserted against Defendants, which has a vested interest in contesting those claims; (ii) the instant controversy is between parties which are adverse and antagonistic; (iii) the County has a direct, substantial, and present interest in the resolution of the instant controversy; and (iv) this controversy is ripe for judicial determination and adjudication, and the County seek a binding decree establishing both the existence of a public nuisance, and Defendants' contribution to it.

**WHEREFORE**, the County respectfully requests that this Court enter judgment against Defendants and award the declaratory relief sought, as well as all supplemental relief that this Court may deem appropriate, together with the costs of litigation and reasonable attorneys' fees.

ANAPOL WEISS

BY:  _David S. Senoff_
_____
DAVID S. SENOFF, ESQUIRE
HILLARY B. WEINSTEIN, ESQUIRE
CLAYTON P. FLAHERTY, ESQUIRE
130 N. 18TH STREET, SUITE 1600
PHILADELPHIA, PA 19103

DATED: OCTOBER 4, 2018

<u>VERIFICATION</u>

I, Lee Soltysiak, do verify that the information contained in the foregoing Complaint is true and correct to the best of my knowledge, information and belief.   I understand that false statements herein made are subject to the penalties of 18 Pa.C.S. §4904 relating to unsworn falsification to authorities.

Lee Soltysiak, Chief Operating Officer for
Montgomery County, PA

DATED: 10/4/18

Case# 2018-23539-0 Docketed at Montgomery County Prothonotary on 10/04/2018 4:57 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT D

LIA13755

# Baltimore's City Government Specifies White Lead

HOW white lead and oil helps to solve a large city's painting problems is well illustrated by the experience of the City of Baltimore, Md.

Since their switch to white lead specifications early in 1937, the City Bureau of Central Purchase reports that they have been free from many of the difficulties that were experienced in the past with the purchase of other paints, and are getting the most satisfactory results with their white lead program.

Before 1937, Baltimore purchased paint under specifications calling for a multi-pigment paint meeting various minimum requirements. This system, however, showed numerous drawbacks. Most important of these according to J. H. Gaston, Purchasing Agent for the City of Baltimore, was the difficulty in obtaining a uniform product. Better standardization of paint specifications was needed if Baltimore was to have more efficient purchasing and greater satisfaction from its painting. As a result, the Board of Central Purchase began a program calling for pure white lead paint. Today this city specifies white lead and oil paint for over 65% of its total paint purchases, with the percentage of white lead over other paints increasing every year. The yearly increase in white lead consumption by the City of Baltimore is clearly shown by the following figures:



*The Municipal Office Building of the City of Baltimore. All exterior trim and the entire interior of this building have been painted with pure white lead and oil in accordance with City of Baltimore specifications*

| | |
|---|---|
| 1936............ | 6,325 lb. |
| 1937............ | 27,850 lb. |
| 1938............ | 99,575 lb. |
| 1939............ | 103,725 lb. |

In a recent interview, Mr. Gaston expressed the following views in behalf of the Bureau of Central Purchase:

"We are having excellent results with pure white lead and oil. Purchasing has been made much easier and more efficient and we are noticeably free from the difficulties we once had with some of the lower grade paints on the market. Although there are many excellent ready mixed paints, it is frequently difficult to differentiate between the good and the bad. We are finding that our lead and oil jobs are not only giving us the best of service but are proving highly economical as well. At present, white lead constitutes over 65% of our total paint purchases. We are going to increase this percentage every year because we feel that white lead does a better all around job than any other paint."

There are many excellent reasons why white lead has solved Baltimore's



*The Nurses Home at the Baltimore City Hospital. Pure white lead paint provides lasting decoration for interior walls*

[ 10 ]

LIA13756

paint problem. Paste white lead is a standard product, which, when bought from any of the established white lead manufacturers, will be found to be of highest quality and uniformity. Since white lead is so thoroughly standardized, its specification and purchase is greatly simplified. This fact and the recognized durability and low cost of white lead has made it the one paint that completely satisfies Baltimore's paint requirements.

Illustrated on this page and on the cover are some of the Baltimore city buildings recently painted with pure white lead paint in accordance with the new specifications for city painting. These principle buildings and many others including a majority of the City schools are now being painted both exterior and interior with pure white lead and oil.



*The Baltimore City Hospital. Exterior trim and all interior rooms except a few requiring special treatment are painted with pure white lead and oil and permitting repeated washings for sanitary purposes*

# F. H. A. Modernization Drive in Full Swing

ANOTHER nation-wide modernization drive sponsored by the Federal Housing Administration was begun in mid-August and is now proceeding at a rapid pace. Among the many items eligible for loans, painting, sheet metal work and roofing, and plumbing modernization are three of the most important and popular.

The campaign offers an excellent opportunity to architects, builders, contractors and others to benefit by the widespread interest aroused by the F. H. A. publicity. An attractive window display in three colors, a two-color booklet for distribution to home owners by contractors, and a manual for contractors explaining how they may increase their sales through the F. H. A. installment payment plan are all available free of charge. They may be obtained directly from the F. H. A. at Washington or its 64 field offices.

Armed with such excellent sales material contractors should experience no difficulty in pushing remodeling work, especially where they plan to use lead products. In many cases remodeling must be done in cramped spaces where rigid materials are difficult to install. This is true of both plumbing and sheet metal work. In plumbing, additional bathrooms, new fixtures, shower stalls and new pipes to replace old clogged or leaking pipes are easily roughed in with flexible lead pipe. With lead pipe unusual bends and changes in direction, necessitated many times by remodeling work, are but a simple matter. Their installation with screwed systems would mean many extra fittings and a consequent increase in cost. Also, by eliminating the projecting bulk of such fittings, the lead piping may fit into the smallest possible space. The flexibility of sheet lead, too, renders this same working advantage, flashings and other new and replacement work being easily and snugly fit into even the most difficult corners. Moreover, the fact that the new low cost of hard lead flashing makes this material competitive with other metals commonly used is a sales factor of great importance to home owners who wish to obtain the most from their building dollar.

Whether in new work or repainting there is, of course, no substitute for pure white lead, and the economy of white lead jobs will he an added sales factor to help contractors obtain remodeling work.



*Window streamer and side pieces each measuring 60 x 16 in. provided to contractors by the F.H.A. to help them tie in with fall modernization drive. At right, a window display poster, 28¼ x 38¼ in., also provided.*

